**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK DIVISION**

| | |
|---|---|
| JOON BANG, RAZVAN VICTOR BENGULESCU, GERALD BEZEMS, SCOTT CROCKETT, RIFAT GORENER, CHRISTOPHER LESIEUR, LAWRENCE MARCUS, and MIKHAIL SULEYMANOV, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>    vs.<br><br>BMW OF NORTH AMERICA, LLC, BAVARIAN MOTOR WORKS, and DOES 1 through 10, inclusive,<br><br>              Defendants. | NO.:  2:15-CV-6945<br><br><br>CLASS ACTION<br><br><br><br>JURY TRIAL DEMANDED |

<u>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**</u>

Plaintiffs JOON BANG, RAZVAN VICTOR BENGULESCU, GERALD BEZEMS, SCOTT CROCKETT, RIFAT GORENER, CHRISTOPHER LESIEUR, LAWRENCE MARCUS, and MIKHAIL SULEYMANOV bring this action against BMW OF NORTH AMERICA, LLC, ("BMW-NA") and BAVARIAN MOTOR WORKS ("BMW-GER") (together, "BMW" or "Defendants") on behalf of themselves and all others similarly situated, as more specifically described below, who purchased or leased BMW automobiles containing the N63B44O0 ("N63") model engine.  BMWs containing the N63 engine are defective, breach BMW's express and implied warranties, and were deceptively marketed and sold to consumers.

# TABLE OF CONTENTS

*Page*

I     **INTRODUCTION** ................................................................................ 1

II    **PARTIES** .......................................................................................... 3

III   **JURISDICTION AND VENUE** ...................................................... 5

      **NEW JERSEY LAW APPLIES** ...................................................... 6

      **TOLLING OF STATUTES OF LIMITATIONS** ............................ 7

IV   **FACTUAL ALLEGATIONS** ............................................................ 8

      **The N63 Engine** ............................................................................. 8

      **The Burning Oil Defect** ................................................................ 9

      **The Battery Defect** ....................................................................... 21

      **BMW'S New Vehicle Limited Warranty** ................................... 26

      **Plaintiffs' N63 Vehicle Failures** ................................................ 29

          **Plaintiff Joon Bang** ......................................................... 29

          **Plaintiff Razvan Victor Bengulescu** .............................. 31

          **Plaintiff Gerald Bezems** ................................................. 32

          **Plaintiff Scott Crockett** .................................................. 33

          **Plaintiff Rifat Gorener** .................................................. 35

          **Plaintiff Christopher LeSieur** ....................................... 36

          **Plaintiff Lawrence Marcus** ........................................... 39

          **Plaintiff Mikhail Suleymanov** ...................................... 41

      **BMW's Knowledge of the Defects** ............................................. 43

V    **CLASS ACTION ALLEGATIONS** ............................................... 44

      **The Proposed Classes** ................................................................. 44

          **Nationwide Class** ............................................................. 44

          **New Jersey Class** ............................................................. 45

          **California Class** ............................................................... 45

          **New York Class** ............................................................... 45

          **Washington Class** ............................................................ 45

          **Kansas Class** .................................................................... 45

          **Texas Class** ...................................................................... 45

          **Connecticut Class** ............................................................ 45

i

**Numerosity** ................................................................................................ 46

**Common Questions of Law and Fact** ........................................................ 47

**Typicality** .................................................................................................. 48

**Adequacy of Representation** .................................................................... 48

**Superiority** ................................................................................................ 49

VI    **CAUSES OF ACTION** ............................................................................. 49

**Violation of New Jersey Consumer Fraud Act** ...................................... 49

**Breach of Express Warranty** ................................................................... 53

**Breach of Implied Warranty** ................................................................... 55

**Violation of Magnuson-Moss Warranty Act** .......................................... 57

**Violation of California's Consumer Legal Remedies Act** ...................... 60

**Violation of the California Business and Professional Code** ................. 64

**Violation of the California False Advertising Law** ................................. 66

**Violation of the Song-Beverly Act – Breach of Express Warranty** ....... 68

**Violation of the Song-Beverly Act – Breach of Implied Warranty** ........ 69

**Violation of New York General Business Law § 349** ............................. 71

**Violation of New York General Business Law § 350** ............................. 72

**Violation of the Washington Consumer Protection Act** ......................... 74

**Violation of the Kansas Consumer Protection Act** ................................. 76

**Violation of the Texas Deceptive Practices Act** ..................................... 78

**Violation of the Connecticut Deceptive Trade Practices Act** ................. 81

**PRAYER FOR RELIEF** .......................................................................... 82

# I        INTRODUCTION

1.        In 2008, BMW introduced a new V8, twin-turbocharged engine, which BMW and enthusiasts refer to as the "N63."  This large, high-performance engine was designed to be BMW's next generation V8 and was placed in certain BMW 5 Series, 6 Series, 7 Series, X5, and X6 vehicles from the 2009 through 2014 model years (hereinafter, the "Class Vehicles").[1]

2.        The N63 engine was defectively designed and/or manufactured.  Among other things, one of the distinct features of the N63 engine is that the engine's two turbochargers are placed on top of the engine, between the engine's cylinder heads and within the V configuration of the engine block.  Typically, most auto manufacturers locate turbochargers outside of this V configuration, away from components that can become damaged or impacted from the excessive heat of the turbochargers.  BMW's unique configuration saves space under the hood, but causes excessive heat-soak to the N63 engine and surrounding components.

3.        *First*, the Class Vehicles suffer from an Oil Consumption Defect.  This defect causes the N63 engine to consume excessive amounts of engine oil between regularly scheduled service visits.  Consumer Reports recently published a study on excessive engine oil consumption, which compiled complaints regarding nearly 500,000 individual vehicles.  The study concluded that BMW models containing the N63 engine made up four of the five worst performers, including the worst performer on the list, the BMW 5 Series equipped with the N63 engine (i.e. "BMW 5 Series (V8)"), which consumes excessive amounts of engine oil at a rate 27 times greater than the average vehicle. This defect will cost owners of the Class Vehicles

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

thousands of dollars over the lives of their vehicles and will significantly impair the resale value of the Class Vehicles.

| RANK | MAKE & MODEL | % OF VEHICLES THAT NEEDED AT LEAST A QUART OF OIL BETWEEN CHANGES | | | | |
|------|--------------|------|------|------|------|------|
| | | 2010 | 2011 | 2012 | 2013 | 2014 |
| 1 | BMW 5 Series (V8) | * | 43 | 33 | 36 | 15 |
| 2 | BMW 7 Series | 38 | 34 | 35 | 37 | 11 |
| 3 | BMW 6 Series | 18 | – | 18 | 38 | 11 |
| 4 | Porsche Panamera | 61 | 39 | 20 | 22 | 5 |
| 5 | BMW X5 (V8) | * | 29 | 23 | 10 | 11 |
| 6 | Audi A4 (2.0T) | 58 | 48 | 9 | 4 | 2 |
| 7 | Audi A5 | 52 | 34 | 10 | 3 | 2 |
| 8 | Audi Q5 (2.0T) | 24 | 55 | 11 | 7 | 0 |
| 9 | Porsche Cayenne | 26 | 23 | 21 | 7 | 2 |
| 10 | Audi A6 (V6) | 20 | 17 | 22 | 3 | 2 |

(http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

4.      *Second,* the Class Vehicles suffer from a Battery Defect.  As described in a recent Road and Track article, *Enginerdy: Why BMW's N63 twin-turbo V8 eats batteries,* the design of the N63 engine, along with unique placement of the twin turbochargers and extended cooling required even after the engine is turned off, damages the electrical systems in the Class Vehicles and causes excessive battery strain, which in turn requires frequent battery replacement.  The Battery Defect is such a frequent problem that BMW now instructs its service representatives to replace batteries in the Class Vehicles at *every service visit,* unless it has been replaced within the previous 12 months.  This defect will cost owners of the Class Vehicles thousands of dollars over the lives of their vehicles and will significantly impair the resale value of the Class Vehicles.  (http://www.roadandtrack.com/car-culture/buying-maintenance/a25710/enginerdy-strange-connections-bmw-n63-v8/.)

## II      PARTIES

5.      Plaintiff Joon Bang resides in Los Angeles, California.  On or about February 24, 2014, Plaintiff Bang leased a new 2014 BMW 750i containing the N63 engine from Beverly Hills BMW, an authorized BMW retailer in Beverly Hills, California.

6.      Plaintiff Razvan Victor Bengulescu resides in Seattle, Washington.  In April 2015, Plaintiff Bengulescu purchased a used 2011 BMW 750i containing the N63 engine from Elliot Bay Auto Brokers in Seattle, Washington.

7.      Plaintiff Gerald Bezems resides in Wescoville, Pennsylvania.  On May 9, 2014, Plaintiff Bezems purchased a used 2012 BMW X5 xDrive50i SUV containing the N63 engine from BMW of Westchester in White Plains, New York, an authorized BMW retailer.

8.      Plaintiff Scott Crockett resides in the Village of Loch Lloyd, Cass County, Missouri.  In May 2013, Plaintiff Crockett purchased a new 2013 BMW X5 xDrive50i SUV containing the N63 engine from Baron BMW in Merriam, Kansas, an authorized BMW retailer.

9.      Plaintiff Rifat Gorener resides in Naperville, Illinois.  In August 2013, Plaintiff Gorener purchased a used 2011 BMW 750 Li xDrive containing the N63 engine from a dealership in Houston, Texas.

10.      Plaintiff Christopher LeSieur resides in Petaluma, California.  In September 2011, Plaintiff LeSieur purchased a new 2011 BMW 550i containing the N63 engine from Hansel BMW of Santa Rosa, an authorized BMW retailer in Santa Rosa, California.

11.      Plaintiff Lawrence Marcus resides in Ellington, Connecticut.  In December 2014, Plaintiff Marcus purchased a used 2011 BMW 550i Gran Turismo xDrive containing the N63 engine from New Country BMW in Hartford, Connecticut, an authorized BMW retailer.

12.     Plaintiff Mikhail Suleymanov resides in Rego Park, New York.  In February 2015, Plaintiff Suleymanov purchased a used 2011 BMW 550i xDrive from Princeton BMW in Princeton, New Jersey, an authorized BMW retailer.

13.     Defendant Bavarian Motor Works ("BMW-GER"), is a corporation organized and existing under the laws of Germany, with its principal place of business located in Munich, Bavaria, Germany.  BMW-GER is the parent corporation of BMW of North America, LLC.

14.     Defendant BMW of North America, LLC ("BMW-NA") is organized under the laws of Delaware with its principal place of business located at 300 Chestnut Ridge Road, Woodcliff, New Jersey.  BMW-NA was created in 1975 to act as the United States importer of BMW luxury and performance vehicles, which were traditionally manufactured in Munich, Germany.  The company sells vehicles through 338 independently-owned dealerships across the United States.  At all relevant times, BMW was engaged in the business of importing, assembling, marketing, distributing, and warranting BMW automobiles in the State of New Jersey and throughout the United States.

15.     BMW-NA and BMW-GER sell BMW vehicles through a network of dealerships that are agents of BMW-NA and BMW-GER.

16.     There exists, and at all times herein existed, a unity of ownership between BMW-NA, BMW-GER, and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.

17.     Upon information and belief, Defendant BMW-GER communicates with Defendant BMW-NA concerning virtually all aspects of the BMW products it distributes within the United States.

4

18.     Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation and decisions regarding the Class Vehicles' engines as they relate to the engine defect within the Class Vehicles were performed exclusively by Defendants BMW-NA and BMW-GER.

19.     Upon information and belief, Defendants BMW-NA and BMW-GER developed the post-purchase owner's manuals, warranty booklets, and information included in maintenance recommendations and/or schedules for the Class Vehicles.

20.     BMW engages in continuous and substantial business in New Jersey.

21.     Upon information and belief, Plaintiffs allege that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants.  In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

### III       JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because Plaintiffs and Defendants are citizens of different states and because, upon information and belief, the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs present a claim under the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*.  The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant BMW-NA, resides and is headquartered in this district, regularly transacts substantial business in this district, is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district.  Additionally, Defendants have advertised in this district and have received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

24.     This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within New Jersey and throughout the United States.

## NEW JERSEY LAW APPLIES

25.     It is appropriate to apply New Jersey law to the nationwide claims because New Jersey's interest in this litigation exceeds that of any other state.

26.     New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, 14th Amend., § 1, and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution.  New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

27.     As discussed above, Defendant BMW-NA is headquartered in Woodcliff Lake, New Jersey and is the sole entity in the contiguous 48 U.S. states responsible for distributing, selling, leasing and warranting BMW vehicles.

28.     BMW's customer relations, technical training center, engineering, marketing, and warranty departments are all located in BMW-NA's Woodcliff Lake campus.  BMW's customer relations department is responsible for fielding customer complaints and monitoring customer complaints posted to BMW or third-party websites.  BMW's warranty and engineering departments are both responsible for the decisions to conceal the engine defect from BMW's customers, and for instituting a policy to systematically deny warranty coverage to those who experienced engine failure caused by the defect.  BMW also has a vehicle preparation center in Port Jersey, New Jersey, where BMW inspects and prepares its vehicles for distribution throughout the United States, including the Class Vehicles.

29.     Defendants own property and conduct substantial business in New Jersey and, therefore, New Jersey has an interest in regulating Defendants' conduct under its laws.  Defendants' decision to reside in New Jersey and avail themselves of New Jersey's laws renders the application of New Jersey law to the claims herein constitutionally permissible.

30.     Based on the foregoing, such policies, practices, acts and omissions giving rise to this Action were developed in, and emanated from, BMW's headquarters in Woodcliff Lake, New Jersey.  As detailed below, BMW also came to know, or should have come to know, of the Oil Consumption and Battery Defects through the activities of BMW divisions and affiliated entities located within New Jersey.  Accordingly, the State of New Jersey has the most significant relationship to this litigation and its law should govern.

**TOLLING OF STATUTES OF LIMITATIONS**

31.     Any applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiff and the members of the

Class could not have reasonably discovered the true, latent nature of the engine defects until shortly before this class action litigation was commenced.

32.     In addition, even after Plaintiffs and Class Members contacted Defendants and/or their authorized dealers for vehicle repairs concerning the Oil Consumption Defect and Battery Defect, they were routinely told by Defendants and/or through its dealers that the Class Vehicles were not defective.

33.     Defendants were and remain under a continuing duty to disclose to Plaintiffs and the members of the Class the true character, quality and nature of the Class Vehicles, *i.e.* that the Class Vehicle engines and batteries are defective and will require costly repairs, pose safety concerns, and diminish the resale value of the Class Vehicles.  As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## IV     FACTUAL ALLEGATIONS

### The N63 Engine

34.     The BMW N63B44O0 is a twin turbo, direct-injected V8 engine included on certain BMW vehicles from the 2009 through 2014 model years.  Upon information and belief, the N63 engine was included on the V8 versions of the following BMW vehicles which comprise the Class Vehicles:

> F01 and F02 (7 Series Sedan) – produced from 3/2009 to 6/2012
> F04 (Active Hybrid 7) – produced from 4/2010 to 6/2012
> F07 (Gran Turismo) – produced from 9/2009 to 6/2012
> F10 (5 Series Sedan) – produced from 3/2010 to 7/2013
> F12 (6 Series Convertible) – produced from 3/2011 to 7/2012
> F13 (6 Series Coupe) – produced from 7/2011 to 7/2012
> E70 (X5) – produced from 3/2010 to 6/2013
> E71 (X6) – produced from 7/2008 to 6/2014
> E72 (ActiveHybrid X6) – produced from 9/2009 to 9/2011

35.     Many of these model vehicles were offered with both six-cylinder and eight-cylinder engines.  These vehicles produced eight-cylinder engines contain the N63 engine at issue, which is indicated by "50i" appearing at the end of the full model description.  For instance, Plaintiff Scott Crocket purchased an "X5 xDrive50i" BMW vehicle.  The "X5" describes the base model and "50i" indicates his SUV is equipped with a V8 engine, instead of the standard 6-cylinder engine (indicated by "35i").

36.     The N63 has become widely known and described as defective throughout the automotive industry and the BMW-enthusiast community.  It is widely recognized that N63 engines consume excessive amounts of engine oil, require frequent engine repairs, and require frequent battery replacements, especially as compared to other, similar vehicles not containing N63 engines.

37.     Some owners and enthusiasts blame both the Oil Consumption and Battery Defects on BMW's decision to place the N63's twin-turbochargers between the cylinder heads, and inside of the engine V, rather than outside of the engine V, away from sensitive components, where turbochargers are typically located.

**The Oil Consumption Defect**

38.     N63 vehicles are notorious for consuming excessive amounts of engine oil and frequently need additional engine oil between scheduled oil changes to prevent catastrophic engine damage or failure.

39.     The Oil Consumption Defect was particularly apparent in a recent Consumer Reports study on excessive oil consumption.  Consumer Reports studied 498,900 vehicles across several makes and models for complaints about engine oil consumption and concluded that BMW's N63 engine was included on four out of the five most defective vehicles.

9

(http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

Consumer Reports released the following list of worst performers:

| RANK | MAKE & MODEL | % OF VEHICLES THAT NEEDED AT LEAST A QUART OF OIL BETWEEN CHANGES | | | | |
|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 |
| 1 | BMW 5 Series (V8) | * | 43 | 33 | 36 | 15 |
| 2 | BMW 7 Series | 38 | 34 | 35 | 37 | 11 |
| 3 | BMW 6 Series | 18 | – | 18 | 38 | 11 |
| 4 | Porsche Panamera | 61 | 39 | 20 | 22 | 5 |
| 5 | BMW X5 (V8) | * | 29 | 23 | 10 | 11 |
| 6 | Audi A4 (2.0T) | 58 | 48 | 9 | 4 | 2 |
| 7 | Audi A5 | 52 | 34 | 10 | 3 | 2 |
| 8 | Audi Q5 (2.0T) | 24 | 55 | 11 | 7 | 0 |
| 9 | Porsche Cayenne | 26 | 23 | 21 | 7 | 2 |
| 10 | Audi A6 (V6) | 20 | 17 | 22 | 3 | 2 |
| 11 | Audi S4 | 37 | 19 | 11 | 3 | 0 |
| 12 | Audi A3 (2.0T) | 9 | 13 | 11 | 6 | – |
| 13 | Subaru Outback (6-cyl.) | 14 | 17 | 13 | 3 | 2 |
| 14 | Audi S5 | 26 | 11 | 8 | 4 | 1 |
| 15 | Audi Q7 | 10 | 7 | 15 | 5 | 3 |
| 16 | BMW X1 (6-cyl.) | – | – | – | 7 | 2 |
| 17 | Subaru Legacy (6-cyl.) | 19 | 15 | 13 | 2 | 0 |
| 18 | BMW 335i Sedan | 8 | 5 | 9 | 9 | 3 |
| 19 | Audi A7 (V6) | – | – | 17 | 3 | 0 |
| 20 | BMW 5 Series (6-cyl.) | 8 | 8 | 8 | 8 | 2 |

40.     As shown, the V8 version of the BMW 5 Series, which contained the N63 engine in 2011, 2012, and 2013 model years, was the worst performer in the study with 43 percent of vehicles needing an additional quart of oil between oil changes as of 2015.  BMW's 6 Series and 7 Series, many of which contained the N63 engine, are the next worst performers.  Finally, the V8 version of the X5 was the fifth worst performer in the study.

41.     The above table also shows that a greater percentage of defective models start to consume oil as they age.  This means that large numbers of N63 owners will begin to experience the Oil Consumption Defect in the near future if they have not already.

42.     The Consumer Report article also included the following chart, which shows the percentage of all surveyed vehicles that required at least one quart of oil added between changes (not the result of an oil leak), sorted by model year.



43.     As shown above, only 2 percent of all surveyed 2011 vehicles reported needing an extra quart of engine oil added between oil changes, as of the study date.  In contrast, 43 percent of 2011 BMW 5 Series V8s, which all contain the N63 engine, required additional engine oil to be added between BMW's recommended oil change intervals.

44.     As a whole, only 2 percent of the 2010-14 vehicles included in the study required extra engine oil between intervals.  However, BMW's 5 Series (V8) led to 27 times more complaints about excessive engine oil consumption than the average vehicle.

45.     Many purchasers of vehicles containing the N63 engine have become upset about the excessive engine oil consumption – which was not disclosed by BMW in the product literature – and have posted internet complaints about specific frustrations and hassles caused by the Oil Consumption Defect.

46.     For example, one N63 purchaser started a thread entitled "Excessive oil consumption" on a BMW enthusiast website in November 2011:

> So I'm starting to get a little irritated at how much oil my 550 is burning.  In the last 6k I've had to add 1 quart of oil three times.  In other words it is burning a quart every 2,000 miles.  I've read some

11

people posting about having to add oil before but this much??  I've
never owned a new car that burned any oil much less at this rate.
Anyone else having this issue?  Oh btw the car has 9120 miles and
I put 3100 in Europe during my ED.  When I was to have redelivery
I had the dealer do an oil change and was gonna change the oil every
7.5k.

(http://www.bimmerfest.com/forums/showthread.php?t=581072.)

47.    A fellow BMW enthusiast responded with four separate links about the oil

consumption issue and explained that the defect "was a hot topic back in September" 2011.  (*Id.*)

48.    Complaints filed by consumers with the National Highway Traffic Safety

Administration ("NHTSA") and posted on the Internet also demonstrate that the defect is

widespread (note that spelling and grammatical errors are as found in the original postings):

**NHTSA ID Number**:  10678748
**Date Complaint Filed**:  01/25/2015
**Vehicle**:  2011 BMW 550I
**Summary**:
HAVE TO ADD OIL EVEY 500 MILES, AND I DID NOTICE
THERES [sic] A RECALL ON THE CAR BUT BMW DOES NOT
WANT TO CALL IT A RECALL. I THINK TI [sic] MAY EFFECT
CAR 5 YEARS FROM NOW.

_____

**NHTSA ID Number**:  10691781
          **Date Complaint Filed**:  March 3, 2015
          **Vehicle**:  2012 BMW X6
**Summary**:
VEHICLE HAS BEEN SMOKING, BURNING OIL AND
LEAVING A BLACK RESIDUE ON TAIL PIPES AND ON
PAINT AROUND TAILPIPES SINCE APPROXIMATELY 6
MONTHS OLD. BMW SERVICE ADVISED OIL USAGE WAS
NORMAL FOR VEHICLE AND REFUSED TO INVESTIGATE
FURTHER. OIL CONSUMPTION HAS CONTINUED TO
INCREASE TO AS MUCH AS 6 QUARTS IN LESS THAN 5,000
MILES. HAVING SERIOUS ENGINE MALFUNCTIONS WITH
ENGINE SHUT DOWN, WITHOUT WARNING AND
WITHOUT ABILITY TO COMPENSATE FOR TRAFFIC
CONDITIONS. BELIEVE THERE IS AN INHERENT DEFECT
IN THE ENGINE AND THAT CAR IS A DANGER. BMW

12

SERVICE SIMPLY CHECKS FOR VISIBLE OIL LEAKS BUT
REFUSES TO INVESTIGATE FURTHER.

_____

**NHTSA ID Number**:  10692476
     **Date Complaint Filed**:  March 9, 2015
     **Vehicle**:  2012 BMW 750LI
**Summary**:
CONSUMER WRITES IN REGARDS TO HIGH OIL
CONSUMPTION. *SMD THE CONSUMER STATED HE HAD
TO ADD OIL FREQUENTLY.

_____

**NHTSA ID Number**:  10534669
     **Date Complaint Filed**:  August 10, 2013
     **Vehicle**:  2013 BMW 550I
**Summary**:
ENGINE CONTINUES TO BURN THROUGH OIL
APPROXIMATELY EVERY 1,500 MILES, WHICH COULD
LEAVE THE VEHICLE STRANDED AND INOPERABLE. IT'S
UNACCEPTABLE IN A BRAND NEW VEHICLE.

_____

**Online Complaint**
     **Date of Complaint**: May 21, 2013
     **Vehicle**:  2013 BMW 750
**Summary**:
     I got a new 2013 750 this last February and I am having
problems with the oil levels.
     I drove the car for 2,700 and I got a indicator that the oil
levels were low.
     I went to the dealer and put 1 QT of oil. After 20 days I got
it again at 3700 miles.
     I went to the dealer and put another QT and measured the
level, it was a the top.
     Two days later, I re-measure the level and now is at the mid
level.  No response from the dealer with a logical answer, same from
BMW HQ, just phone talk and no real answers.

49.    An Internet search of "N63 AND Burning Oil" reveals thousands of similar

complaints regarding the Oil Consumption Defect.[2]

_____

[2] *See, e.g.*, http://www.bimmerfest.com/forums/showthread.php?t=581072 (last visited Mar. 21,
2016); http://www.e90post.com/forums/showthread.php?t=874786 (last visited Mar. 21, 2016).

50. BMW had a duty to disclose the Oil Consumption Defect and the associated out-of-pocket repair costs since the defect poses an unreasonable safety hazard, and because BMW had exclusive knowledge or access to material facts about N63 vehicles and engines, not known or reasonably discoverable by consumers. Defendants, however, failed to disclose the Oil Consumption Defect to consumers prior to or at the time of purchase or lease.

51. The Oil Consumption Defect has become so problematic that BMW has issued several technical service bulletins ("TSBs") to address complaints of excessive oil consumption and other problems related to the N63 engine.[3]

52. With regard to the oil consumption issue, BMW issued the following TSBs:

> NHTSA ID Number:  10046859
> Service Bulletin Number:  SIB-11-08-12
> Summary:  DUE TO DAMAGED SEAL RING, DURING ASSEMBLY, ENGINE OIL IS LEAKING FROM ENGINE OIL PUMP VOLUME CONTROL VALVE GASKET SEAL RING. MODELS E70, E71, F01, F02, F04, F07, F10, F12, F13. NO MODEL YEARS LISTED.

---

> NHTSA ID Number:  10045282
> Service Bulletin Number:  SIB-11-07-12
> Summary:  BMW: WHILE DRIVING VEHICLE, AT TIMES WOULD BE ROUGH RUNNING; WHITE OR BLUE SMOKE SEEN EXITING EXHAUST SYSTEM AND THE ENGINE OIL IS CONSUMED ABOVE SPECIFICATIONS.

---

53. In June 2013, BMW issued SIB-11-01-13, which took the extraordinary step of changing engine oil consumption specifications for N63 vehicles, and specifically instructed

---

[3] TSBs are recommended repairs issued by automotive manufacturers and directed only to automotive dealers. TSBs are frequently issued when a manufacturer receives widespread reports of a particular problem with its vehicles. The BMW TSB numbers that are related to the allegations in this Complaint include, but are not limited to, SIB-11-08-12, SIB-11-07-12, SIB-11-01-13, SIB-11-03-13, and SB-B61-30-14.

service technicians to add two quarts of engine oil to N63 vehicles when the vehicles instruct

owners to add only one additional quart of oil.  Upon information and belief, this bulletin reads

as follows:

> Subject: N63 and N63T Engine: Engine Oil Consumption, Engine
> Oil Top-ups and Refill Capacity
> MODEL
> F01 F02 F06 F07 F10 F12 F13 E70 E71
>
> **Customers with one of the vehicles above may complain that the
> engine's oil consumption is "too high," resulting in engine oil
> top-ups and workshop visits to address the issue before the
> vehicle displays an engine oil service as being "due."**  When the
> vehicle's engine oil drops to the minimum level, a message will
> display in the vehicle advising the driver to "add 1 quart of engine
> oil."  After topping up and continued operation, the "add engine oil"
> message may display again before an engine oil service is required
> and performed.
>
> Cause:
> Engines that are fitted with a turbocharger, as part of their normal
> operation, will consume engine oil at a higher rate than a naturally
> aspirated engine (non-turbocharged engine). In this case, a
> "turbocharged" engine could require topping up of the engine oil
> more frequently.
>
> Procedure:
> Engine oil - Topping up
> **When one of the above vehicles displays a message to add 1
> quart of engine oil, BMW recommends adding 2 quarts of
> engine oil instead.**  The engine's oil sump design allows the
> additional quart; the result is a total capacity of 9.5 quarts (9.0 liters)
> of engine oil.
>
> Engine oil:
> Maintenance services and engine repairs
> When performing all future engine oil maintenance services and
> repairs that require draining and refilling the engine oil, the new
> recommended refill specification is 9.5 quarts (9.0 liters) of engine
> oil.
>
> . . .

(http://www.xbimmers.com/forums/showthread.php?p=14449679 (emphasis added).)

54.     As shown, instead of addressing the underlying cause of excessive oil consumption in order to attempt to fix that defect, BMW recommended that its service technicians simply add more engine oil to respond to consumer complaints.  Technicians were instructed to add two quarts of engine oil when the vehicles electronic system specifically called for one additional quart and to also add an additional quart as the default fill on N63 vehicles. While BMW did not address the underlying problem, it likely reduced the number of complaints because the engine oil level in Class Vehicles would now be overfilled, a condition that can cause the engine oil to become aeriated, resulting in potential oil starvation and reduced oil pressure.

55.     Technical Service Bulletin SI B11 01 13 appears to be part of a campaign to conceal the Oil Consumption Defect and represent it as a normal feature of BMW vehicles.  To this effect, BMW issued SIB-11-03-13, which upon information and belief includes the following:

Service Bulletin Number:  SIB-11-03-13

Summary:  All engines normally consume a certain amount of engine oil. This is necessary in order to properly lubricate the cylinder walls, pistons, piston rings, valves and turbocharger(s), if equipped. In addition, engines with less than 6,000 miles will generally consume additional engine oil because the internal engine components are not fully seated (break-in). Therefore, engine oil consumption complaints received prior to 6,000 miles cannot be considered.

Once a new or remanufactured engine has accumulated 6,000 miles, oil consumption can be considered if there is a drastic change in the engine oil consumption rate (e.g., the engine oil consumption rate triples) under similar driving conditions.

Engines equipped with a turbocharger(s) will consume more engine oil than normally aspirated engines (non-turbocharged). The additional oil that is consumed in a turbocharged engine is mainly

due to the turbocharger lubrication requirements. Some of the engine oil normally migrates past the turbocharger turbine bearing seals and will enter the intake tract of the engine.

All turbocharged engines also require a complex crankcase ventilation system. The crankcase ventilation system needs to maintain a small vacuum on the crankcase and not allow the crankcase to be pressurized. Pressurizing the engine crankcase can lead to external engine oil leaks and increased engine oil consumption via the piston rings and valve seals. When the load and the boost level of a turbocharged engine is varied, the path of the crankcase pressure is changed. During the crankcase ventilation path transition, a small amount of engine oil will pass through the crankcase ventilation system and is additionally consumed. The additional engine oil consumption of a turbocharged engine, as compared to a normally aspirated engine, is normal and not a defect.

Oil Consumption specification:

- All BMW engines (excluding Motorsport) can consume up to 1 quart of engine oil per 750 miles at any time.

- Due to the increased engine power, all Motorsport engines can consume up to 2.5 quarts of engine oil per 1,000 miles at any time.

Turbocharged Engines:

Engines that are fitted with a turbocharger(s) will consume more engine oil than naturally aspirated engines (non-turbocharged engines). In this case, a turbocharged engine could require topping of engine oil more frequently. For vehicles with N63 and N63T engines, refer to SI B11 01 13 for additional details.

56.    BMW included every conceivable driving situation within this Service Bulletin as a factor for engine oil consumption so as to minimize their own responsibility and/or deflect blame onto consumers for the Oil Consumption Defect.  As can be seen from the TSBs, Defendants continued to misrepresent to their customers that the rate of oil consumption in the N63 engines was normal and to be expected in engines that are fitted with turbochargers.

57.     BMW made these representations notwithstanding that the stated recommended oil service interval at the time of sale of the Class Vehicles was the earlier of 15,000 miles or two years.  Of course, at the rate of engine oil consumption referred to in BMW's service bulletin, the N63 vehicles would consume nearly 20 quarts of engine oil between the recommended 15,000-mile oil service intervals.  Clearly, there is nothing normal or expected about this rate of oil consumption.

58.     Many N63 purchasers and automobile consumer advocates disagree that this level of engine oil consumption is normal and instead believe that it is excessive and well beyond normal.

59.     Consumer Reports offered its opinion of excessive oil consumption in the subtitle of its article: *Excessive oil consumption isn't normal: Automakers say adding oil between scheduled changes is acceptable. It's not.* (http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

60.     Following hundreds of customer complaints about the Oil Consumption Defect and other problems with N63 vehicles, BMW launched the "N63 Customer Care Package" (bulletin B001314) on December 29, 2014 (herein, "Customer Care Package").  The Customer Care Package consisted of several different measures, which merely mask, but do not correct, the serious design and/or manufacturing defects of the N63 engine including the Oil Consumption Defect.

61.     *First*, the Customer Care Package instructed service representatives to check each covered vehicle's timing chain, fuel injectors, mass air flow sensors, crankcase vent lines, battery, engine vacuum pump, and low pressure fuel sensor, and replace if necessary.  BMW

instructed its service representatives to inspect and replace these components for free, even if no longer covered by the manufacturer's standard four-year/50,000 mile warranty.

62.     *Second,* BMW had long emphasized the fact that its vehicles can go long periods without service and sold many N63 vehicles with the promise of a two-year or 15,000 mile service interval.  The Customer Care Package significantly reduced the mileage of its recommended engine oil change intervals for all Class Vehicles.  As a result, BMW reduced the oil change intervals from the earlier of 15,000/two years to the earlier of 10,000 miles or one year.

63.     *Third*, BMW simultaneously launched the "N63 Customer Loyalty Offer" which offered purchasers discounts on new BMW vehicles to replace their defective N63 vehicles.

64.     *Fourth*, BMW also launched a related "N63 Customer Appreciation Program," which authorized dealerships to provide purchasers with up to $50 of BMW merchandise or accessories.

65.     Engine oil is important because it functions as an essential lubricant for the moving parts in internal combustion engines.  The oil creates a film separating surfaces of adjacent moving parts to minimize direct contact, thereby decreasing heat caused by friction and reducing wear.  Engine oil also has important cleaning and sealing functions, and serves as an important medium for dissipating heat throughout the engine.  As a result, the Class Vehicles need the proper amount of engine oil in order for the engine and its related parts to function safely.

66.     As suggested by the N63 Customer Care Package, upon information and belief, the Oil Consumption Defect impacts several components of N63 vehicles, either via combustion of excessive amounts of engine oil directly or by causing these components a lack of appropriate

19

lubrication, which results in these components to prematurely fail and need frequent replacement.

67.     The Oil Consumption Defect is a safety concern because it prevents the engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted.  Therefore, this Oil Consumption Defect is unreasonably dangerous because it can cause engine failure while the Class Vehicles are in operation at any time and under any driving conditions or speeds, thereby exposing the Class Vehicle drivers, their passengers, and others who share the road with them to serious risk of accidents and injury.

68.     Plaintiffs are informed and believe, and based thereon allege that BMW acquired its knowledge of the Oil Consumption Defect in 2008, if not before, through sources not available to Class Members, including but not limited to pre-release testing data, durability testing, early consumer complaints about the Oil Consumption Defect to Defendants and their dealers, testing conducted in response to those complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates, as well as, from other internal sources.

69.     Defendants had a duty to disclose the Oil Consumption Defect and the associated out-of-pocket repair costs to Class Members because the defect poses an unreasonable safety hazard, and because Defendants had exclusive knowledge or access to material facts about the Class Vehicles that were not known or reasonably discoverable by the Class.  Defendants, however, failed to disclose the Oil Consumption Defect to consumers prior to or at the time of purchase or lease.

70.     The Oil Consumption Defect can be enormously consequential to Class Members, burdening them with out-of-pocket expenses that would not be necessary but for such defect and depriving them of their original bargains.  First, excessive engine oil consumption requires additional service visits and increased maintenance costs due to the recently decreased oil change intervals, which many N63 purchasers specifically sought to avoid by purchasing high-end BMW vehicles.  Second, the Oil Consumption Defect means that N63 owners must be concerned with obtaining BMW-approved engine oil when needed.  If owners continue to drive without adding oil, their vehicles might catastrophically fail and strand them or potentially cause a life-threatening accident.  This discourages many owners from traveling long distances in their N63 vehicles or forces N63 owners to carry an extra supply of oil.  Third, N63 owners will suffer significant loss when they sell the Class Vehicles because the reputation of these vehicles has been impaired by now-public research establishing that these vehicles suffer from the Oil Consumption Defect.

## **The Battery Defect**

71.     The defective nature of the N63 engine also causes BMW vehicles to suffer from the premature failure of Class Vehicles' batteries.  This defect forces the Class Vehicles' batteries to rapidly deteriorate and require replacement every 10,000 miles or one year, well before the expected useful life of an automotive battery (the "Battery Defect").

72.     One BMW enthusiast described the Battery Defect in a June 2015 Road & Track article, *Enginerdy: Why BMW's N63 twin-turbo V8 eats batteries: When cars get complicated, weird things happen. In the search for fuel economy and prodigious output, BMW's N63 twin-turbo V8 happens to chew through batteries*.  In the article, the author explains that BMW's standard battery configuration worked for most American consumers until it was used with the

21

N63 engine.  This is because the twin turbochargers are located inside the engine V on the N63 engines.  This causes the additional accumulation of excessive heat, which requires the Class Vehicles' engine fans to run long after these vehicles have been turned off.  As a result of this excessive stress, the batteries in the Class Vehicles prematurely fail and require frequent replacement.  (http://www.roadandtrack.com/car-culture/buying-maintenance/a25710/enginerdy-strange-connections-bmw-n63-v8/.)

73.     This article was posted in a BMW-aficionado thread, *R&T: BMW's N63 Motor (M5, M6, 750i, etc) will need a new battery every 10,000 miles*, where several BMW fans agreed with the article's assessment of the defect.  One N63 owner agreed and expressed his frustration:

> I think they explained the problem perfectly.  **Fans run from anywhere from 10 to 15 minutes AFTER the car is shut off.  How does that NOT drain the battery?**  All due to heat soak in the engine bay, which in turn is due to the placement of the turbos inside the "vee." . . .  And who do you think is going to pay for that new battery once the warranty is up?  BMW should stop trying to do the "easy" thing and do the "RIGHT thing for their customers.  Reprogram the charging system so I don't need a new battery every 10K.

(http://www.bimmerfest.com/forums/showthread.php?t=843143 (emphasis added).)

74.     Another responded to the article in a separate *Detailed report on a major issue with the N63 engine* thread: "Great read.  It's actually atrocious how BMW has handled the entire N63 build.  It's almost like Frankenstein's Monster at this point.  Each and every owner should be able to get new batteries each time a car is brought in for whatever the reason." (http://www.bimmerfest.com/forums/showthread.php?t=843101.)

75.     There are thousands of additional consumer complaints regarding the Battery Defect available on the internet.

76.     In response to widespread frustration with N63 battery failures, BMW issued Technical Service Bulletin SIB-61-30-14 (the "Battery Defect Bulletin") in December 2014. The purpose of this bulletin was to instruct BMW service representatives to replace N63 vehicle batteries at every oil change if the battery had not been replaced in the previous 12 months.  This bulletin provides N63 owners with free replacement batteries, but only until the expiration of BMW's 4 year or 50,000 mile Standard Maintenance Program.  When that expires, N63 owners will be forced to constantly replace batteries at their own expense for the remaining lives of their vehicles.

77.     This service bulletin, with the subject line "BMW Maintenance Program: 12-Volt Battery Replacement Measure" applies to all BMW X5's containing the N63 engine produced from April 2010 until June 2013.

78.     The Bulletin went into effect January 1, 2015, and applied to only those vehicles still covered under BMW's Standard Maintenance Program, which provides new vehicle services, at no cost, for 4 years or 50,000 miles.  The Battery Defect Bulletin includes the following explanation of the Battery Defect and the manufacturer's policy to replace N63 batteries at every oil change:

**Vehicles with an N63 Engine**

Vehicles with N63 engines require additional cooling capacity, and the activation of various cooling system components places additional demands on the battery.

Several enhancements have been made to the power management system on such vehicles.  However, in a quest to ensure total customer satisfaction, please replace the 12-volt battery on a preventative maintenance basis at every engine oil service (engine oil service counter #1, #2, #3, etc.), unless the battery was replaced within the last 12 months.

79.     The Bulletin also recommends that service representatives replace earlier model 90/92 AH batteries (part number 61 21 2 353 812) with newer, more powerful 105 AH batteries (part number 61 21 2 353 814).  This was BMW's attempt to make the batteries in the Class Vehicles require less frequent replacement by BMW.

80.     The article referenced above, *Enginerdy: Why BMW's N63 twin-turbo V8 eats batteries*, explains that this is a temporary patch, not a permanent solution to the Battery Defect:

> The simple solution would be to reprogram the engine computers to keep battery's state of charge at a higher level.  But in modern cars, everything affects something else, most often in the most unlikely of ways.   Charging the battery more often would affect fuel economy, which would require BMW to recertify the cars with the EPA. . . .
>
> **So BMW can't actually fix the battery problem, it can only mask it. . . .**

(http://www.roadandtrack.com/car-culture/buying-maintenance/a25710/enginerdy-strange-connections-bmw-n63-v8/ (emphasis added).)

81.     BMW instructed its service representative to code battery replacements under "**Defect Code: 85 10 02 56 MP**."  Upon information and belief, this defect code refers to the Battery Defect and was known by BMW before January 1, 2015.

82.     Significantly, though acknowledging the significant energy demands of the N63's cooling system, Defendants have taken no steps to provide a remedy for owners of Class Vehicles once the Standard Maintenance Program expires.

83.     Upon expiration of the Standard Maintenance Program, Plaintiffs and the Class Members will be forced to replace the batteries within the Class Vehicles as often as once a year or 10,000 miles, at a significant expense.

84.     Plaintiffs allege, based on information and belief, that Defendants were aware of the defect in the N63 engine resulting in abnormally high engine oil consumption and premature battery wear long before the sale of Class Vehicles and before the issuance of their technical service bulletins addressing these issues.  BMW had knowledge of these issues through sources not available to Class Members, including but not limited to pre-release testing data, durability testing, early consumer complaints about premature battery failure to Defendants and their dealers, testing conducted in response to those complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates that can cost in the thousands of dollars for each Class Vehicle, as well as, from other internal sources.

85.     Customers have reported the Oil Consumption Defect and Battery Defect in the Class Vehicles to Defendants directly and through BMW's authorized dealerships.  Defendants are fully aware of the Oil Consumption and Battery Defects contained in the Class Vehicles. Despite this, Defendants have failed to disclose and have actively concealed the existence and nature of the defects from Plaintiffs and the Class Members at the time of purchase or lease and thereafter.  Specifically, Defendants have:

(a)     failed to disclose, at and after the time of purchase and thereafter, any and all known material defects or material nonconformities of the Class Vehicles;

(b)     failed to disclose at the time of purchase that the Class Vehicles and their engines were not in good working order, were defective, and were not fit for their intended purpose; and

(c)     failed to disclose or actively concealed the fact that the Class Vehicles and their engines were defective as a result of the Oil Consumption and Battery Defects,

despite the fact that Defendants knew or should have known of such defects prior to the first Class Vehicles being sold.

## BMW'S New Vehicle Limited Warranty

86.     The Class Vehicles were sold with a standard BMW New Vehicle Limited Warranty, which the company refers to as its "New SAV Limited Warranty."  Upon information and belief, the New SAV Limited Warranty is materially identical to the BMW warranties on all other N63 vehicles.  Collectively, these practically identical warranties will be referred to as BMW's "New Vehicle Limited Warranty."

87.     The New Vehicle Limited Warranty includes the following terms:

**Warrantor**

BMW of North America, LLC (BMW NA) warrants 2013 U.S.-specification SAVs distributed by BMW NA or sold through the BMW NA European Delivery Program against defects in materials or workmanship to the first retail purchaser, and each subsequent purchaser.

**Warranty Period**

The warranty period is 48 months or 50,000 miles, whichever occurs first.

**Warranty Begins**

Coverage begins on the date of first retail sale or the date the vehicle is first placed into service as a sales demonstrator, Aftersales Mobility Program (AMP) Vehicle or company vehicle, whichever is earlier.

**Warranty Coverage**

To obtain warranty service coverage, the vehicle must be brought, upon discovery of a defect in material or workmanship, to the workshop of any authorized BMW SAV center in the United States or Puerto Rico, during normal business hours. The authorized BMW SAV center will, without charge for parts or labor, either repair or

26

replace the defective part(s) using new or authorized remanufactured parts. The decision to repair or replace said part(s) is solely the prerogative of BMW NA. Parts for which replacement are made become the property of BMW NA.

In all cases, a reasonable time must be allowed for warranty repairs to be completed after the vehicle is received by the authorized BMW SAV center.

88.     BMW also offers a Certified Pre-Owned Warranty on used BMW vehicles sold from authorized BMW retailers. This warranty is practically identical to original warranty, with certain additional exclusions, and provides coverage against defects and workmanship for 2 years/50,000 miles after the expiration of the New Vehicle Limited Warranty for a total coverage period of 6 years/100,000 miles.

89.     The New Vehicle Limited Warranty does not protect N63 purchasers from the Oil Consumption Defect or the Battery Defect because BMW's efforts temporarily mask these conditions instead of providing purchasers with non-defective vehicles as originally warranted.

90.     BMW has attempted to mask the Oil Consumption Defect until the expiration of the New Vehicle Limited Warranty by (1) reducing the service interval of N63 vehicles from once every two years or 15,000 miles to once every one year or 10,000 miles; and (2) instructing service representatives and owners to overfill the Class Vehicles with engine oil. These measures fail to remedy the defect because Class Members are still left with a defective engine that consumes engine oil after the expiration of the New Vehicle Limited Warranty. As a result, Class Vehicle owners are forced to pay for additional oil between service visits, are forced to worry about their vehicles spontaneously needing oil away from an authorized service center, are forced to incur increased maintenance costs as a result of more-frequent engine oil changes, and will be forced to sell or trade their vehicles for a decreased value.

91.     BMW has attempted to mask the Battery Defect until the expiration of the New Vehicle Limited Warranty by instituting the Battery Defect Bulletin, which provides replacement batteries through the expiration of BMW's four-year/50,000 mile Standard Maintenance Program.  The Battery Defect Bulletin fails as a remedy because owners will be forced to replace their batteries every 10,000 to 20,000 miles for the duration of ownership.  This need for frequent, expensive battery replacements will significantly harm the resale value of the Class Vehicles.

92.     Nevertheless, Defendants have caused Plaintiffs and Class Members to expend money at their dealerships or other third-party repair facilities and/or take other remedial measures related to the Oil Consumption and Battery Defects in the Class Vehicles such as carrying additional quarts of engine oil with them at all times.

93.     Defendants have not recalled the Class Vehicles to repair the Oil Consumption and Battery Defects, and have not offered to reimburse Class Vehicle owners and leaseholders who incurred costs relating to the Oil Consumption and Battery Defects.

94.     Consequently, Plaintiffs and the Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

95.     As a result of the Oil Consumption and Battery Defects, the value of the Class Vehicles has diminished, including, without limitation, the resale value of the Class Vehicles.

96.     For example, one BMW enthusiast was reluctant to purchase an N63 vehicle, even after the N63 Customer Care Package:

> I am looking into a purchase of an out of warranty 2011 550i 6 speed with low miles.  The dealer selling it took it in to the BMW dealer for the customer care [recall].  I have the repair invoice. . . .
>
> The dealer advises [sic] there is no extended warranty on the engine as a consequence of the recall, just a 2 year warranty on the limited

work done.  Sad, but I think I'm going to walk away from this deal and continue searching for a CPO car.  **Having a BMW V8 with known problems out of warranty doesn't seem a smart move, even if the car is fine right now.**

(http://www.bimmerfest.com/forums/showthread.php?t=818901 (emphasis added).)

97.     A current N63 owner started a thread, *Advice needed, 2011 7 series with n63 engine*, with the following complaint about the overall quality and value of his vehicle:

> Ok, I've had the car 3 years, bought it used from a dealer, 20k miles on it when I bought it, now 98k miles.  Lots of maintenance since I've had it, etc, etc. . . .
>
> My guy at the repair shop (a BMW Certified Shop but not a BMW dealership) tells me that as soon as I get the car fixed I need to sell it.  **He calls it a "throw away" car, says it's the worst car BMW has ever made.  Says he's seen older model 7 series get 500,000 miles no problem, but these N63 Engines have been a disaster for BMW, and that he wouldn't have one that wasn't under warranty.** Says black smoke out the tail pipe is the next thing I should start seeing.

(http://www.bimmerfest.com/forums/showthread.php?t=824755 (emphasis added).)

98.     Another enthusiast responded, "**The consensus is to not to own one out of warranty** . . . ."  (*Id.* (emphasis added).)

### Plaintiffs' N63 Vehicle Failures

**Plaintiff Joon Bang**

99.     In late February 2014, Plaintiff Bang leased a new 2014 BMW 750i containing the N63 engine from Beverly Hills BMW, an authorized BMW retailer.  Plaintiff Bang leased her vehicle primarily for personal, family, and/or household use.

100.    Plaintiff Bang's vehicle was covered by Defendants' New Vehicle Limited Warranty when she leased the vehicle.

101.    On or about May 5, 2014, with approximately 2,607 miles on the odometer, Plaintiff Bang returned to the Beverly Hills BMW service center regarding her vehicle consuming engine oil at an abnormally high rate.  The service technicians added one quart of oil and recommended that Plaintiff Bang monitor her vehicle's engine oil consumption.

102.    On or about June 23, with approximately 4,930 miles on the odometer, Plaintiff Bang returned to the service center when her "check engine oil" light activated and her vehicle began to shake.  The BMW technicians determined that her vehicle was four quarts low on engine oil, which means the vehicle had consumed an average of one quart of engine oil for every 565 miles driven.

103.    On July 30, 2014, with 5,810 miles on the odometer, Plaintiff again brought her vehicle to the Beverly Hills BMW dealership, at which time, the dealership added another quart of oil.

104.    Subsequently, Plaintiff Bang has brought the vehicle to the BMW dealership on at least five more occasions for complaints of excessive engine oil consumption.  Each time, Plaintiff Bang was advised that the rate of oil consumption was "normal" and that it was normal for her vehicle to consumer one quart of oil every 750 miles.

105.    Plaintiff Bang relied on the existence and length of Defendants' New Vehicle Limited Warranty prior to purchasing her vehicle.  Plaintiff Bang reasonably expected that her vehicle and its components, including the rate, if any, of engine oil consumption and premature battery failure, would not be defective and would continue to function normally in accordance with Defendants' specifications and representations.

106.    Plaintiff Bang was not told that Class Vehicles frequently consume excessive amounts of engine oil and would require additional engine oil between scheduled service visits

30

before she purchased the vehicle.  Plaintiff Bang would not have purchased the vehicle if she was aware of the Oil Consumption Defect.

107.    Plaintiff Bang was not told that the Class Vehicles require frequent battery replacements as a result of the Battery Defect in the N63 engines.  Plaintiff Bang would not have purchased her vehicle if she was made aware of the Battery Defect prior to purchase.

**Plaintiff Razvan Victor Bengulescu**

108.    In April 2015, Plaintiff Bengulescu purchased a pre-owned 2011 BMW 750i containing the N63 engine from Elliot Bay Auto Brokers in Seattle, Washington.  At the time of purchase, his vehicle showed approximately 44,000 miles on the odometer.  Plaintiff Bengulescu purchased his vehicle primarily for personal, family, and/or household use.

109.    Plaintiff Bengulescu's vehicle was covered by the remainder of Defendants' New Vehicle Limited Warranty when he purchased the vehicle.

110.    Plaintiff Bengulescu relied on the existence and length of Defendants' New Vehicle Limited Warranty when deciding to purchase the vehicle.  Plaintiff Bengulescu reasonably expected that the vehicle and its components, including the rate, if any, of engine oil and premature battery life, would not be defective and would continue to function normally in accordance with Defendants' specifications and representations.

111.    Plaintiff Bengulescu's vehicle started needing additional engine oil during the first week he owned the vehicle in April 2015.  Despite several repair attempts, his vehicle still consumes excessive engine oil and now requires an additional quart of oil approximately every other week.

112.    Plaintiff Bengulescu's battery has failed on multiple occasions and has been replaced by BMW under the terms of the New Vehicle Limited Warranty.

113.     Plaintiff Bengulescu has provided Defendants with multiple opportunities to cure his vehicle's defects by presenting the vehicle to BMW Northwest, Inc., in Fife, Washington, an authorized BMW service center, in accordance with the New Vehicle Limited Warranty.

114.     Plaintiff Bengulescu's vehicle has been so problematic that he attempted to trade-in the vehicle four months after purchase.  Upon information and belief, due to the Oil Consumption and Battery Defects, the dealer offered him half of what he had paid for the vehicle four months earlier.

115.     Plaintiff Bengulescu was not told that the Class Vehicles frequently consume excessive amounts of engine oil and require additional engine oil between scheduled service visits before he purchased his vehicle.  He would not have purchased the vehicle if he was aware of the Oil Consumption Defect.

116.     Plaintiff Bengulescu was not told that the Class Vehicles require frequent battery replacements as a result of the N63 Battery Defect.  He would not have purchased his vehicle if he was made aware of the Battery Defect prior to purchase.

**Plaintiff Gerald Bezems**

117.     On May 9, 2014, Plaintiff Bezems purchased a pre-owned 2012 BMW X5 xDrive50i SUV containing the N63 engine from BMW of Westchester in White Plains, New York.  At the time of purchase, his vehicle showed approximately 18,259 miles on the odometer. Plaintiff Bezems purchased his vehicle primarily for personal, family, and/or household use.

118.     Plaintiff Bezems' vehicle was covered by the remainder of Defendants' New Vehicle Limited Warranty at the time of his purchase.

119.     Plaintiff Bezems relied on the existence and length of Defendants' New Vehicle Limited Warranty when deciding to purchase the vehicle.  Plaintiff Bezems reasonably expected

that his vehicle and its components, including the rate, if any, of engine oil consumption and premature battery failure, would not be defective and would continue to function normally in accordance with Defendants' specifications and representations.

120.    Plaintiff Bezems reviewed and relied on information contained on the original vehicle sticker as well as on various BMW NA websites when deciding to purchase his vehicle.

121.    The battery in Plaintiff Bezem's vehicle was replaced by Daniels BMW in Allentown, PA, an authorized BMW service center, pursuant to SIB 61 30 14, as part of the N63 Customer Care Package.

122.    As a result of the Customer Care Package, the engine oil service intervals on Plaintiff Bezems' vehicle were decreased from 15,000 miles or 2 years, as when he originally purchased the vehicle, to 10,000 miles or 1 year.

123.    Plaintiff Bezems was not told that the Class Vehicles frequently consume excessive amounts of engine oil and require additional oil between scheduled service visits before he purchased his vehicle.  Plaintiff Bezems would not have purchased the vehicle if he was made aware of the Oil Consumption Defect.

124.    Plaintiff Bezems was not told that the Class Vehicles require frequent battery replacements as a result of the Battery Defect.  He would not have purchased his vehicle if he was made aware of the Battery Defect prior to purchase.

**Plaintiff Scott Crockett**

125.    In May 2013, Plaintiff Crockett purchased a new 2013 BMW X5 xDrive50i SUV containing the N63 engine from Baron BMW, an authorized BMW retailer, in Merriam, Kansas. Plaintiff Crocket purchased his vehicle primarily for his personal, family, and/or household use.

126.     Plaintiff Crockett's vehicle was covered by Defendants' New Vehicle Limited Warranty when he purchased the vehicle.

127.     Plaintiff Crockett relied on the existence and length of Defendants' New Vehicle Limited Warranty when deciding to purchase the vehicle.  He reasonably expected that his vehicle and its components, including the rate, if any, of engine oil consumption and premature battery failure, would not be defective and would continue to function normally in accordance with Defendants' specifications and representations.

128.     Sometime in spring 2014, Plaintiff Crockett was driving his 10-month old X5 when the vehicle alerted him that the engine oil level was critically low.  Plaintiff Crockett became concerned and called Baron BMW, who told him that the vehicle's engine was known for consuming excessive amounts of engine oil and often needed additional changes between scheduled oil changes.  Baron BMW added an additional quart of engine oil at no cost.

129.     In or around spring 2015, Crockett took his X5 to Baron BMW for another service visit. At such time, the service technician mentioned that he had replaced his battery free of charge under BMW's Standard Maintenance Plan.

130.     Plaintiff Crockett subsequently had the N63 Customer Care Package performed in September 2015.

131.     Plaintiff Crockett has given Defendants multiple opportunities to cure by contacting Baron BMW in Merriam, Kansas, in accordance with the New Vehicle Limited Warranty but Defendants have failed to correct the underlying Oil Consumption Defect and Battery Defect.

132.     Plaintiff Crockett was not told that the Class Vehicles frequently consume excessive amounts of oil and would require additional engine oil between scheduled service

visits before he purchased the vehicle.  Plaintiff Crockett would not have purchased the vehicle if he was aware of the Oil Consumption Defect.

133.    Plaintiff Crockett was not told that the Class Vehicles require frequent battery replacements as a result of the Battery Defect in the N63 engines.  Plaintiff Crockett would not have purchased his vehicle if he was made aware of the Battery Defect prior to purchase.

**Plaintiff Rifat Gorener**

134.    In August 2013, Plaintiff Gorener purchased a pre-owned 2011 BMW 750Li xDrive containing the N63 engine from a dealership in Houston, Texas.  At the time of purchase, his vehicle showed approximately 50,000 miles on the odometer.  Plaintiff Gorener purchased this vehicle primarily for his personal, family and/or household use.

135.    Plaintiff Gorener researched, reviewed, and relied on various BMW NA promotional materials and specifications when deciding to purchase his vehicle.

136.    Exactly one day after purchase, Plaintiff Gorener's vehicle broke down and gave an error message indicating that the engine oil level was low.  Since purchasing his vehicle, in August 2013, Plaintiff Gorener's vehicle has consistently needed additional engine oil between scheduled service visits.  Upon information and belief, Plaintiff Gorener has been forced to add approximately 20 quarts of additional engine oil on at least 15 occasions while owning the vehicle.

137.    Approximately one month after purchase, Plaintiff Gorener's vehicle displayed an error message regarding the vehicle's battery.  As a result, Plaintiff Gorener replaced the battery.  Approximately six months later, Plaintiff Gorener was again forced to replace his battery for a second time.

138.    Plaintiff Gorener was not told that the Class Vehicles frequently consume excessive amounts of oil and require additional engine oil between scheduled service visits before he purchased his vehicle.  He would not have purchased the vehicle if he was aware of the Oil Consumption Defect.

139.    Plaintiff Gorener was not told that the Class Vehicles require frequent battery replacements as a result of the Battery Defect.  He would not have purchased his vehicle if he was made aware of the Battery Defect prior to purchase.

**Plaintiff Christopher LeSieur**

140.    On or about September 30, 2011, Plaintiff LeSieur purchased a new 2011 BMW 550i from Hansel BMW of Santa Rosa, an authorized BMW retailer in Sonoma County, California.  Plaintiff LeSieur purchased his vehicle primarily for personal, family, or household use.

141.    Plaintiff LeSieur's vehicle was covered by Defendants' New Vehicle Limited Warranty when he purchased the vehicle.

142.    Plaintiff LeSieur relied on the existence and length of Defendants' New Vehicle Limited Warranty prior to purchasing his vehicle.  Plaintiff LeSieur reasonably expected that his vehicle and its components, including the rate, if any, of engine oil consumption and premature battery failure, would not be defective and would continue to function normally in accordance with Defendants' specifications and representations.

143.    Passenger safety and reliability were factors in Plaintiff LeSieur's decision to purchase his vehicle.  Prior to purchasing his vehicle, Plaintiff LeSieur reviewed specific features and options for the 550i on BMW's official website and discussed features and options with a BMW salesperson prior to his purchase.

36

144.     Since purchasing his Class Vehicle, Plaintiff has experienced the Oil Consumption Defect.  For example, on or about January 14, 2013, with approximately 14,928 miles on the odometer, Plaintiff LeSieur brought his vehicle to Hansel BMW of Santa Rosa for a scheduled oil change.  Less than three months later, with approximately 18,039 miles on the odometer, on or about March 19, 2013, Plaintiff brought his vehicle to Hansel BMW after receiving a vehicle warning that the engine oil level was low.  The dealer kept the vehicle for two days, yet the repair order states that the only repair performed was "ADDED 1 QT OF OIL TO VEHICLE."

145.     Subsequently, on or about July 2, 2013, with approximately 22,550 miles on the odometer of his 2011 BMW 550i, Plaintiff LeSieur brought his vehicle to Hansel BMW after again receiving a vehicle warning that engine oil level was low.  The dealer kept Plaintiff's vehicle for ten days, yet the repair order states that the only repair performed was "ADDED 1 QT OF OIL."

146.     Further, on or about January 29, 2014, with approximately 30,341 miles on the odometer, Plaintiff LeSieur brought his vehicle to Hansel BMW after receiving another vehicle warning that the engine oil level was low.  The BMW service technician added a quart of oil at that time.  Then, less than 300 miles later, with approximately 30,615 miles on the odometer, Plaintiff LeSieur brought his vehicle to Hansel BMW, where they performed "ENGINE OIL SERVICE."

147.     On or about June 16, 2014, with approximately 37,652 miles on the odometer, Plaintiff LeSieur brought his vehicle to Hansel BMW for low oil and the service technician added a quart of oil at that time.  Then, on or about July 14, 2014, with approximately 38,757 miles on the odometer, Plaintiff LeSieur brought his vehicle to Hansel BMW for low oil and the

service technician performed "ENGINE OIL SERVICE."  Then, with approximately 40,352 miles on the odometer, on or about August 8, 2014, Plaintiff LeSieur brought his vehicle back to Hansel BMW due to his vehicle exhibiting smoke out of the exhaust.  The service technician inspected Plaintiff's vehicle and performed "LIGHT DUTY ENGINE REPAIR" including replacing engine vent lines and crankcase breather lines.

148.     On or about November 20, 2014, Plaintiff LeSieur brought his vehicle to Hansel BMW for low engine oil.  The dealer kept the vehicle for eight (8) days and the service technician added one (1) quart of oil.  Then, on or about January 13, 2015, with approximately 43,878 miles on the odometer, Plaintiff LeSieur brought his BMW vehicle to Hansel BMW after receiving a vehicle warning to service engine soon and complaining that the vehicle smokes from exhaust "excessively."  The dealer kept the vehicle for a week.  The service technician diagnosed the vehicle and performed repairs pursuant to "N63 Engine: Customer Care Package" and "N63 Engine: Check the Timing Chain" including changing oil and filter and replacing vacuum pump, injectors, mass air flow meters, all four crankcase ventilation pipes, and sensors.

149.     Additionally, on or about March 16, 2015, with approximately 45,871 miles on the odometer, Plaintiff LeSieur brought his BMW vehicle to Hansel BMW after receiving a vehicle warning for "drivetrain malfunction" and experiencing reduced acceleration and DSC (dynamic stability control) malfunction.  The BMW service technician noted that the oil level sensor was not operating and performed repairs including replacing the coolant pump, alternator, and dynamic drive valve assembly.

150.     Most recently, Plaintiff LeSieur brought his BMW vehicle to Hansel BMW of Santa Rosa, with approximately 48,323 miles on the odometer, for service maintenance.  The BMW service technician changed the vehicle's engine oil and filter at that time.  Then, with

approximately 48,600 miles on the odometer, Plaintiff LeSieur's vehicle's engine oil gauge indicated that it had consumed ¼ capacity, or approximately 2.25 quarts, in less than 500 miles since the oil change.

151.    At all times, Plaintiff LeSieur, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

152.    Plaintiff LeSieur was not told that vehicles containing the N63 engine frequently consume excessive amounts of oil and require additional engine oil between scheduled service visits before he purchased the vehicle.  He would not have purchased his 550i if he was aware of the Oil Consumption Defect.

153.    Plaintiff LeSieur was not told that N63 vehicles require frequent battery replacements as a result of the Battery Defect.  He would not have purchased his 550i if he was aware of the Battery Defect.

**Plaintiff Lawrence Marcus**

154.    In December 2014, Plaintiff Marcus purchased a pre-owned 2011 BMW 550i Gran Turismo xDrive containing the N63 engine from New Country BMW, an authorized BMW retailer in Hartford, Connecticut.  At the time of purchase, his vehicle showed approximately 44,000 miles on the odometer.  Plaintiff Marcus purchased this vehicle primarily for personal, family and/or household use.

155.    Plaintiff Marcus's vehicle was covered by Defendants' New Vehicle Limited Warranty when he purchased the vehicle and is currently covered by BMW's Certified Pre-Owned Warranty.

156.    Plaintiff Marcus relied on the existence and length of Defendants' New Vehicle Limited Warranty when deciding to purchase the vehicle.  He reasonably expected that his

39

vehicle and its components, including the rate, if any, of engine oil consumption and premature battery failure, would not be defective and would continue to function normally in accordance with Defendants' specifications and representations.

157.    On five separate occasions in 2015, Plaintiff Marcus was forced to add additional engine oil to his vehicle between regularly scheduled service visits.  Each time, his vehicle alerted him that his oil level was critically low and required engine oil to continue operation.

158.    At each instance, Plaintiff Marcus stopped and purchased additional quarts of oil from the nearest gas station.  Plaintiff Marcus paid for this additional oil out-of-pocket and has not been reimbursed by BMW-NA.

159.    In the summer of 2015, the battery in Plaintiff Marcus's vehicle failed and would no longer accept a full charge.  In January 2016, his vehicle began signaling low charge problems when starting the vehicle, which indicates a battery on the brink of failure.

160.    Plaintiff Marcus's vehicle has experienced these batteries failures despite his continuous use of a battery tender to recharge his vehicle at night when he did not drive the vehicle more than 40 miles per day.

161.    Plaintiff Marcus has given Defendants multiple opportunities to cure by contacting New Country BMW in Hartford, Connecticut, in accordance with the New Vehicle Limited Warranty and Certified Pre-owned Warranty but Defendants have failed to correct the underlying Oil Consumption and Battery Defects.

162.    Plaintiff Marcus was not told that the Class Vehicles frequently consume excessive amounts of oil and would require additional engine oil between scheduled service visits before he purchased the vehicle.  Plaintiff Marcus would not have purchased the vehicle if he was aware of the Oil Consumption Defect.

163.     Plaintiff Marcus was not told that the Class Vehicles require frequent battery replacements as a result of the Battery Defect in the N63 engines.  Plaintiff Marcus would not have purchased his vehicle if he was made aware of the Battery Defect prior to purchase.

**Plaintiff Mikhail Suleymanov**

164.     In February 2015, Plaintiff Suleymanov purchased a pre-owned 2011 BMW 550i xDrive containing the N63 engine from Princeton BMW in Princeton, New Jersey, an authorized BMW retailer. At the time of purchase, his vehicle showed approximately 35,787 miles on the odometer.  Plaintiff Suleymanov purchased this vehicle primarily for personal, family and/or household use.

165.     Plaintiff Suleymanov's vehicle was covered by Defendants' New Vehicle Limited Warranty when he purchased the vehicle.  It is currently covered by BMW's Certified Pre-owned Warranty through October 2017.

166.     Plaintiff Suleymanov relied on the existence and length of Defendants' New Vehicle Limited Warranty and Certified Pre-owned Warranty when deciding to purchase the vehicle.  He reasonably expected that his vehicle and its components, including the rate, if any, of engine oil consumption and premature battery failure, would not be defective and would continue to function normally in accordance with Defendants' specifications and representations.

167.     Two months after purchase, Plaintiff Suleymanov's vehicle signaled that it was critically low and needed engine oil added immediately.  Plaintiff Suleymanov purchased oil from the nearest retailer and continued to operate the vehicle.

168.     Since then, Plaintiff Sulemanov has been forced to add additional quarts of oil to his vehicle approximately 8 times, not including regular service visits and top-ups when his

41

vehicle is in for repairs. The vehicle now consumes an additional quart of oil every 600-700 miles.

169.    As a result, on multiple occasions, Plaintiff Suleymanov has been forced to purchase additional quarts of oil.  Plaintiff Suleymanov paid for this additional oil out-of-pocket and has not been reimbursed by BMW-NA.

170.    The battery in Plaintiff Suleymanov's vehicle was recently replaced by his local BMW dealership.

171.    Plaintiff Suleymanov's vehicle has also required extensive repairs during his 13 months of ownership, including the replacement of fuel injectors and other engine components on several occasions.

172.    Plaintiff Suleymanov has given Defendants multiple opportunities to cure by taking his vehicle to Princeton BMW and Rallye BMW in Westbury, New York, in accordance with the New Vehicle Limited Warranty but Defendants have failed to correct the underlying Oil Consumption Defect and Battery Defect.

173.    Plaintiff Suleymanov was not told that the Class Vehicles frequently consume excessive amounts of oil and would require additional engine oil between scheduled service visits before he purchased the vehicle.  Plaintiff Suleymanov would not have purchased the vehicle if he was aware of the Oil Consumption Defect.

174.    Plaintiff Suleymanov was not told that the Class Vehicles require frequent battery replacements as a result of the Battery Defect in the N63 engines.  Plaintiff Suleymanov would not have purchased his vehicle if he was made aware of the Battery Defect prior to purchase.

### BMW's Knowledge of the Defects

175.     Upon information and belief, BMW knew or should have known of the Oil Consumption and Battery Defects long before Plaintiffs purchased their vehicles.  BMW had numerous sources of real-time product feedback from which to learn this information.

176.     *First*, BMW knew or should have known about the Defects as a result of its policy of collecting defective parts when replaced by authorized service technicians.  The New Vehicle Limited Warranty includes, "[p]arts for which replacement are made become the property of BMW NA."  This provision indicates that BMW-NA maintains an internal, regimented process to identify defective components as parts are replaced by BMW service representatives.  This formal defect identification process is further evidenced by Defendants' reference to "Defect Code: 85 10 02 56 MP" in the Battery Defect Bulletin.

177.     *Second*, BMW should have learned of the Defects from warranty reimbursements to its independent service representatives.  The New Vehicle Limited Warranty instructs N63 owners to take their vehicles to authorized service centers for warranty repairs:

> **Warranty Coverage**
> To obtain warranty service coverage, the vehicle must be brought, upon discovery of a defect in material or workmanship, to the workshop of any authorized BMW SAV center in the United States or Puerto Rico, during normal business hours. . . .

This means BMW had a real-time source of product feedback and notice of product failures as soon as N63 owners started to invoke the New Vehicle Limited Warranty.

178.     *Third*, BMW knew or should have known about the Defects from complaints about the N63 made directly to the BMW-NA Customer Relations and Services Department. For example, Plaintiffs' warranty includes the following instructions if a service center fails to address a customer's complaint:

43

> Despite the best intentions of all parties, a misunderstanding may occur between you and your BMW SAV center.  Should this occur and you require further assistance, please contact the BMW NA Customer Relations and Services Department at:
>
> Telephone: 1 800 831-1117
>
> Email: customerrelations@bmwusa.com
>
> Website: www.bmwusa.com

This means that BMW had a direct, real-time source of product feedback that was entirely independent of its service representatives.

179.    *Fourth*, BMW knew or should have known about the defects from public comments and complaints from the BMW-enthusiast community.  As a high-performance luxury automotive brand, BMW has attracted a large number of BMW fans who enjoy discussing their BMW vehicle with other enthusiasts.  There are several websites where BMW owners and enthusiasts post comments, and often complaints, about BMW vehicles.  BMW could have learned of the pervasive extent of the defects from this public source of real-time product failure information.

## V      CLASS ACTION ALLEGATIONS

### The Proposed Classes

180.    Plaintiffs bring this action on behalf of themselves and several potential classes pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

**Nationwide Class**:

All persons and entities who have purchased or leased a Class Vehicle in the United States (including its Territories and the District of Columbia).

44

181.    In the alternative, pursuant to Federal Rules of Civil Procedure, Rule 23(c)(5), Plaintiffs seek to represent the following state classes only in the event that the Court declines to certify the Nationwide Class above.  Specifically, the State Classes consist of each of the following:

**New Jersey Class:**

All persons or entities, including current or former owners and/or lessees, who purchased a Class Vehicle in New Jersey.

**California Class:**

All persons and entities who have purchased or leased a Class Vehicle in California primarily for personal, family or household use, as defined by California Civil Code § 1791(a).

**New York Class:**

All persons or entities, including current or former owners and/or lessees, who purchased a Class Vehicle York.

**Washington Class:**

All persons or entities, including current or former owners and/or lessees, who purchased a Class Vehicle in Washington.

**Kansas Class:**

All persons or entities, including current or former owners and/or lessees, who purchased a Class Vehicle in Kansas.

**Texas Class:**

All persons or entities, including current or former owners and/or lessees, who purchased a Class Vehicle in Texas.

**Connecticut Class**

All persons or entities, including current or former owners and/or lessees, who purchased a Class Vehicle in Connecticut.

182.     Together, the New Jersey Class, California Class, New York Class, Washington Class, Kansas Class, Texas Class, and Connecticut Classes shall be collectively referred to herein as the "State Classes."

183.     Excluded from all classes are the Judge(s) to whom this case is assigned and any member of the Judge's immediate family, along with Defendant BMW-NA'a and BMW-GER's employees, officers, directors, agents, and representatives and their immediate family members. Also excluded are those persons who have suffered personal injuries as a result of the facts alleged herein.

184.     Plaintiffs reserve the right to re-define the Nationwide and/or the State Classes prior to class certification.

**Numerosity**

185.     The members of the proposed Classes are so numerous that joinder of all members is impracticable.

186.     The precise number of Class Members is unknown because this information is in the exclusive control of BMW NA and its affiliated dealerships.

187.     According to one source, there were 124,829 X5 SUVs sold for the 2011, 2012, and 2013 model years.  Some portion of these, the size of which is currently unknown, were manufactured and sold with the defective N63 engine.

188.     The Classes also includes those who purchased N63 engines as part of BMW 5 Series, 6 Series, 7 Series, and X6 vehicles from 2008 until the present.  Upon information and belief, there are tens of thousands of Class Members who own an affected Class Vehicle that fit within the proposed Classes.

### Common Questions of Law and Fact

189.    Several questions of law and fact are common to Plaintiffs in all proposed Classes.  These questions predominate over individualized inquiries.  These legal and factual questions include, but are not limited to:

a.    Whether the Class Vehicles are defective because they frequently burn, leak, and otherwise consume excessive amounts of engine oil;

b.    Whether the Oil Consumption Defect constitutes an unreasonable safety risk;

c.    Whether Class Vehicles are defective because they require an excessive number of battery replacements;

d.    Whether the battery defect constitutes an unreasonable safety risk;

e.    Whether the Class Vehicles are defective because they are unreliable and in need of frequent repair;

f.    Whether the N63 engine was defectively designed and/or manufactured;

g.    Whether BMW knew or should have known the Class Vehicles were defective before they were first sold to consumers;

h.    Whether BMW knew or should have known the Class Vehicles were defective shortly after they were first sold to consumers;

i.    Whether BMW misrepresented or omitted material information regarding the quality and/or reliability of the Class Vehicles;

j.    Whether the Class Vehicles have conformed to reasonable buyers' expectations;

k.    Whether BMW had a duty to inform purchasers of the Class Vehicles about the Oil Consumption Defect prior to sale;

l.    Whether BMW had a duty to inform purchasers of the Class Vehicles about the Battery Defect prior to sale;

m.    Whether BMW misrepresented or intentionally omitted material information when selling the Class Vehicles;

n.    Whether as a result of Defendants' concealment or failure to disclose material facts, Plaintiffs and Class Members acted to their detriment by purchasing Class Vehicles manufactured by Defendants;

o.      Whether Defendants continued to sell Class Vehicles to consumers after it was aware of the Oil Consumption Defect;

p.      Whether Defendants continued to sell Class Vehicles to consumers after it was aware of the Battery Defect;

q.      Whether BMW breached the implied warranty of merchantability with respect to the Class Vehicles;

r.      Whether BMW breached the New Vehicle Limited Warranty by refusing or failing to remedy the Class Vehicles;

s.      Whether Plaintiffs and Class members are entitled to compensatory, exemplary, statutory, or punitive damages and the amount of any such damages;

t.      Whether BMW should be declared financially responsible for notifying Class Members about the defective nature of the Class Vehicles and for all damages to Class Members as a result.

## **Typicality**

190.    Plaintiffs' claims are typical of all Class Members.  Each Plaintiff purchased or leased a defective Class Vehicle, as did each member of the Classes.  Furthermore, Plaintiffs and all Class Members have suffered similar damages as a result of purchasing the Class Vehicles that were assembled, marketed, distributed, and sold by Defendants.

## **Adequacy of Representation**

191.    Plaintiffs will fully and adequately represent and protect the interests of the Classes because they share common injuries and common interests with Class Members as a result of BMW's conduct that was equally applicable across the Classes.

192.    Plaintiffs have retained counsel with substantial experience handling complex litigation in federal courts, including prosecuting numerous class actions.  Plaintiffs and their counsel are committed to vigorously prosecuting this suit on behalf of the Classes and have the financial resources necessary to do so.

48

193.    Neither Plaintiffs nor their counsel have any interests that are contrary to those of the Classes they seek to represent.

**<u>Superiority</u>**

194.    The class action is superior to all other methods of resolving this litigation in a fair and efficient manner.  Plaintiffs are unaware of any difficulties that would prevent prosecution of this litigation as a class action.

195.    If this action were tried individually by Class Members, it would create the risk of inconsistent and varying adjudications concerning the subject of this action.

196.    Absent a class action, the majority of Class Members would be financially unable to litigate these claims individually and would be denied an adequate remedy for BMW's actions that have caused them significant harm.

197.    Class treatment of common questions of law or fact is superior to individual adjudications because it will conserve limited judicial resources and allow for efficient adjudication of the present controversy.

**VI      <u>CAUSES OF ACTION</u>**

**<u>COUNT I</u>**

**Violation of New Jersey Consumer Fraud Act**

**(N.J. Stat. Ann. § 56:8-1, *et seq*.)**

**(By All Plaintiffs on Behalf of the Nationwide Class or, Alternatively, By Plaintiff Suleymanov on Behalf of the New Jersey Class)**

198.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

49

199. Plaintiffs, who have suffered injury in fact and have lost money or property as a result of Defendants' violations of New Jersey's Consumer Fraud Act ("NJCFA"), allege this cause of action as a class action.

200. The NJCFA protects consumers from "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J. Stat. Ann. § 56:8-2.

201. Plaintiffs and Class Members are consumers who purchased and/or leased Class Vehicles for personal, family or household use.

202. Defendants engaged in unlawful conduct by deliberately and knowingly engaging in misrepresentations and false statements regarding the Class Vehicles, in the course of Defendants' business. Specifically, Defendants knew or should have known that the Class Vehicles suffered from an excessive Oil Consumption Defect that required supplemental addition of oil in quantities as high as one quart every 750 miles and required replacement of the battery as frequently as every 10,000 miles or one year. Defendants also knew or should have known that the Class Vehicles suffered from a Battery Defect that required the frequent replacement of the battery, as often as every one year or 10,000 miles. However, Defendants failed to disclose this defect to Plaintiffs and the Nationwide Class at the time of purchase and/or lease.

203. Defendants have also engaged in unlawful conduct by willfully and knowingly suppressing and/or omitting information related to the Class Vehicles to consumers. Specifically, Defendants purposefully and knowingly failed to disclose the Oil Consumption and Battery Defects in the Class Vehicles to consumers such as Plaintiffs and the Class Members, in

order to secure the sale and/or lease of the Class Vehicles at a premium price.  Defendants also failed to disclose the Oil Consumption and Battery Defects during the limited warranty period to avoid having to perform their contractual duties under the warranty to repair all known defects.

204.    Defendants did not fully and truthfully disclose to their customers the true nature of the Oil Consumption and Battery Defect in the Class Vehicles, said defects not being readily discoverable at the time of purchase or lease.

205.    Defendants intended that Plaintiffs and the Class Members rely on their misrepresentation and/or acts of concealment and omission, so that they would purchase and/or lease the Class Vehicles.

206.    Accordingly, Defendants have engaged in unfair and deceptive trade practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent to not sell them as advertised; and otherwise engaging in conduct likely to deceive.  Further, Defendants' acts and practices described herein offend established public policy because of the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Defendants fraudulently concealed the defective nature of the Class Vehicles from consumers.

207.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

208.    By engaging in the above-described practice and the actions and omissions herein alleged, Defendants have committed one or more unlawful acts in violation of the NJCFA.

209.    Defendants' conduct caused Plaintiffs and Class Members to suffer an ascertainable loss.  In addition to direct monetary losses, Plaintiffs and the Class Members have suffered an ascertainable loss in that they received less than what was promised to them by Defendants at the time they purchased and/or leased the subject Class Vehicles.  Plaintiffs and the Class Members have also had to expend time and resources in order to bring their vehicle in for service when the check engine oil light was activated, and will suffer future damages due to the loss in value of the vehicles as a result of the Oil Consumption and Battery Defects.  Therefore, Plaintiffs and the Class Members are entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees and costs of suit.

210.    A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiffs and the Class Members.  Had the defective vehicle design in the Class Vehicles been disclosed, Plaintiffs and the Class Members would not have purchased them or would have paid less for the Class vehicles had they decided to purchase them.

211.    Plaintiffs and the Class Members have suffered an ascertainable loss of monies and pursuant to NJ Stat. § 56:8-19 are entitled to threefold damages.

212.    Unless Defendants are enjoined from continuing to engage in this business practice, Plaintiffs and the Class Members will continue to be injured by Defendants' wrongful actions and conduct.  Therefore, Plaintiffs and the Class Members are entitled to injunctive relief.

213.    Pursuant to N.J. STAT. ANN. § 56:8-20, Plaintiffs have served the New Jersey Attorney General with a copy of this Complaint.

## COUNT II

### Breach of Express Warranty

### (By All Plaintiffs on Behalf of Nationwide Class or, Alternatively, on Behalf of the State Classes)

214.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

215.    BMW assembled and placed the Class Vehicles into the stream of commerce with the intent they be purchased by Plaintiffs and Class Members.

216.    In the New Vehicle Limited Warranty, BMW expressly warranted the Class Vehicles "against defects in materials or workmanship" when first sold to retail purchasers.

217.    BMW also expressly warranted that it would repair or replace defective vehicles, at no cost to the owner, if it receives notice of vehicle defects within the first 48 months or 50,000 miles after the first retail sale.

218.    The terms of BMW's New Vehicle Limited Warranty became part of the basis of the bargain between Plaintiffs and all other Class Members when deciding to purchase a Class Vehicle.

219.    Plaintiffs and Class Members, including second-hand owners who did not purchase Class Vehicles from BMW authorized dealerships, are express, intended third-party beneficiaries of BMW's New Vehicle Limited Warranty because it explicitly extends to "the first retail purchaser, and each subsequent purchaser."

220.    BMW breached its New Vehicle Limited Warranty with respect to the Class Vehicles: (1) Each time it sold Class Vehicles in a defective state to first retail purchasers; (2) Each time its authorized service representatives failed to properly repair, replace, or adjust malfunctioning Class Vehicles to a non-defective state; and (3) Each time it failed to authorize

53

its service representatives to perform adequate repairs on Class Vehicles and instead instructed its representatives to perform temporary, inadequate repairs to mask the underlying defects until after the expiration of the New Vehicle Limited Warranty.

221.   As a result of the Oil Consumption and Battery Defects, the Class Vehicles were defective and did not adhere to the New Vehicle Limited Warranty when first sold and have not been remedied as originally warranted since the time of sale.

222.   By breaching its express warranty, BMW has caused and continues to cause these warranties to fail of their essential purpose.

223.   Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.  Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

224.   The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and the Class Members.  Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Defendants and the Class Members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

225.   BMW has been given a reasonable opportunity to cure its breach of the New Vehicle Limited Warranty and/or Plaintiffs and Class Members were not required to do so because such an opportunity would be futile.  BMW has known about the Oil Consumption and

Battery Defects from customer complaints, service information, and warranty data and has failed to repair or replace Class Vehicles as originally warranted.

226.    As a direct and proximate result of BMW's breach of the New Vehicle Limited Warranty, Plaintiffs and Class Members have suffered damages in an amount to be determined at trial.

227.    Plaintiffs, individually and on behalf of the Nationwide Class, seek all damages permitted by law, including compensation for the monetary difference between the Class Vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred as a result of the Class Vehicles breakdowns; the cost of purchasing, leasing, or renting replacement vehicles; along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## COUNT III

### Breach of Implied Warranty

### (By All Plaintiffs on Behalf of Nationwide Class, or Alternatively on Behalf of the State Classes)

228.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

229.    BMW marketed and placed the Class Vehicles into the stream of commerce with the intent they be purchased by Plaintiffs and Class Members.

230.    BMW is a "merchant" for purposes of the Uniform Commercial Code because the company regularly sells consumer automobiles of this kind.

231.    As a result of the Oil Consumption and Battery Defects, the Class Vehicles were defective and not of merchantable quality when they left BMW's control.  Plaintiffs and Class

Members used their Class Vehicles for the ordinary purpose that consumer automobiles are used—to reliably, comfortably, and safely transport passengers and belongings for personal, family, or household purposes.  Despite Plaintiffs' and Class Members' ordinary and expected use of their vehicles, BMWs containing the N63 engine did not adhere to minimal consumer expectations, were not of fair and average quality, and would not pass without objection in the luxury consumer automotive industry at the time of sale.

232.    As recognized in the New Vehicle Limited Warranty, BMW also extended an implied warranty of merchantability over class vehicles for 48 months or 50,000 miles.  BMW breached this warranty of future performance with respect to the Class Vehicles: (1) Each time its authorized service representatives failed to properly repair, replace, or adjust malfunctioning the Class Vehicles to a minimally passable state; and (2) Each time it failed to authorize its service representatives to perform adequate repairs on the Class Vehicles and instead instructed its representatives to perform temporary, inadequate repairs to the underlying defects mask defects until the expiration of the implied warranty of merchantability.

233.    BMW has been given a reasonable opportunity to cure its breach of the implied warranty of merchantability and/or Plaintiffs and Class Members were not required to do so because such an opportunity would be futile.  BMW has known about the Oil Consumption and Battery Defects from customer complaints, service information, and warranty data and has failed to repair or replace the Class Vehicles to a minimum standard of quality.

234.    Defendants' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

235.     The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and the Class Members.  Among other things, Plaintiffs and the Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Defendants and Class Members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

236.     As a direct and proximate result of BMW's breach of the implied warranty of merchantability, Plaintiffs and Class Members have suffered damages in an amount to be determined at trial.

237.     Plaintiffs, individually, and on behalf of the Nationwide or State Classes, seeks all damages permitted by law, including compensation for the monetary difference between the Class Vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred as a result of the Class Vehicles' breakdowns; the cost of purchasing, leasing, or renting replacement vehicles; along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## COUNT IV

### Violation of Magnuson-Moss Warranty Act

### (15 U.S.C. § 2301, *et seq.*)

### (By All Plaintiffs on Behalf of the Nationwide Class)

238.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

239.    Plaintiffs and other Class Members are "consumers" who purchased "consumer products" for purposes of 15 U.S.C. § 2301(1) and (3) because they purchased Class Vehicles for personal, family, or household purposes and are entitled to invoke the New Vehicle Limited Warranty.

240.    BMW is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5) because the company regularly sells BMW vehicles accompanied by the written New Vehicle Warranties.

241.    The amount in controversy of the Plaintiffs' individual claims meets or exceeds $25.00 in value.  In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

242.    BMW violated the Magnuson-Moss Warranty Act when it failed to honor its written warranty obligations in the New Vehicle Limited Warranty by delivering Class Vehicles that suffered from the Oil Consumption and Battery Defects as described in detail above.

243.    BMW specifically warranted its vehicles "against defects in materials or workmanship" at the time of retail sale and for an additional "48 months or 50,000 miles." BMW extended this warranty "to the first retail purchaser, and each subsequent purchaser" for the duration of the warranty.

244.    The terms of BMW's written New Vehicle Limited Warranty became part of the basis of the bargain between Plaintiffs and all other Class Members when deciding to purchase a Class Vehicle.

245.    BMW breached its written warranty with respect to Class Vehicles: (1) Each time it sold Class Vehicles in a defective state to first retail purchasers; (2) Each time its authorized service representatives failed to properly repair, replace, or adjust malfunctioning Class Vehicles

to a non-defective state; and (3) Each time it failed to authorize its service representatives to perform adequate repairs on Class Vehicles and instead instructed its representatives to perform temporary, inadequate repairs to mask the underlying defects until after the expiration of the New Vehicle Limited Warranty.

246.    BMW also extended an implied warranty of merchantability on Class Vehicles at the time of sale and for the first 48 months or 50,000 miles.

247.    BMW breached the implied warranty of merchantability when it sold Class Vehicles to consumers that suffered from the Oil Consumption and Battery Defects when they left BMW's control.  Plaintiffs and Class Members used their Class Vehicles for the ordinary purpose that consumer automobiles are used—to reliably, comfortably, and safely transport passengers and belongings for personal, family, or household purposes.  Despite Plaintiffs' and Class Members' ordinary and expected use of their vehicles, the Class Vehicles have not lived up to minimal consumer expectations. As a result, BMW breached the implied warranty of merchantability when it sold Class Vehicles that were not of fair average quality and would not pass without objection in the luxury consumer automotive industry at the time of sale.

248.    BMW has been given a reasonable opportunity to cure its breach of the New Vehicle Limited Warranty and implied warranty of merchantability and/or Plaintiffs and Class Members were not required to do so because such an opportunity would be futile.  BMW has known about the Oil Consumption and Battery Defects from customer complaints, service information, and warranty data and has failed to repair or replace Class Vehicles as originally warranted.

249.     As a direct and proximate result of BMW's breach of the New Vehicle Limited Warranty and the implied warranty of merchantability, Plaintiffs and Class Members have suffered damages in an amount to be determined at trial.

250.     Plaintiff Scott Crockett, individually and on behalf of the Nationwide Class, complied with the pre-suit demand requirement in 15 U.S.C. § 2310(e). On September 14, 2015, before any of the currently consolidated actions were filed, Plaintiff Crockett contacted BMW-NA and demanded that the company remedy his vehicle, as well as all other Class Vehicles. BMW-NA has not responded to Plaintiff Crockett's demand..

251.     Plaintiffs, individually and on behalf of the Nationwide Class, seek all damages permitted by law, including compensation for the monetary difference between the Class Vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred as a result of Class Vehicle breakdowns; the cost of purchasing, leasing, or renting replacement vehicles, along with all other incidental and consequential damages, all equitable remedies available pursuant to 15 U.S.C. § 2310(d)(1), statutory attorney fees pursuant to 15 U.S.C. § 2310(d)(2), as well as all other relief allowed by law.

## COUNT V

### Violation of California's Consumer Legal Remedies Act

### (California Civil Code § 1750, *et seq*.)

### (By Plaintiffs Bang and LeSieur on Behalf of the California Class)

252.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

60

253.     California's Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

254.     The Class Vehicles are "goods" as defined in California Civil Code § 1761(a).

255.     BMW is a "person" as that term is defined in California Civil Code § 1761(c).

256.     Plaintiffs Bang and LeSieur and the other California Class Members are "consumers" as defined in California Civil Code § 1761(d).

257.     Plaintiffs Bang's and LeSieur's, and each and every California Class Members', purchase or lease of the subject vehicle constitute a "transaction" as defined by California Civil Code § 1761(e).

258.     As alleged above, Defendants made numerous representations concerning Class Vehicles that were misleading.

259.     The acts and practices of Defendants as discussed throughout the Complaint, constitute "unfair or deceptive acts or practices" by Defendants, that are unlawful, as enumerated in section 1770(a) of the California Civil Code, specifically in at least the following CLRA provisions:

> (a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;
>
> (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;
>
> (a)(7): Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and
>
> (a)(9): Advertising goods and services with the intent not to sell them as advertised.

61

260.    Plaintiffs Bang and LeSieur and the other California Class Members have suffered injury in fact resulting from Defendants' material omissions and misrepresentations because they paid an inflated purchase or lease price for the Class Vehicles.

261.    Defendants knew, should have known, or were reckless in not knowing that the Class Vehicles contained a defect that caused them to consume oil at an abnormally and unreasonably high rate and that caused premature wear of the Class Vehicles' batteries.  As a result, Defendants knowingly and intentionally sold goods that were not of the value or quality that was represented.

262.    Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

263.    Defendants knew that their Class Vehicles and their engines were defectively designed or manufactured, would fail prematurely, would consume excessive oil, require frequent battery replacement, and were not suitable for their intended use.

264.    Defendants were under a duty to Plaintiffs Bang and LeSieur and the California Class Members to disclose the defective nature of the Class Vehicles and the Oil Consumption and Battery Defects because:

> a.    Defendants were in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles and their engines;
>
> b.    Plaintiffs Bang and LeSieur and the California Class Members could not reasonably have been expected to learn or discover that the Class Vehicles and their engine had a dangerous safety defect until manifestation of the

defect; and

c.       Defendants knew that Plaintiffs Bang and LeSieur and the California Class

Members could not reasonably have been expected to learn or discover the

safety and security defects and the associated repair costs that they cause

until the manifestation of the defect.

265.     In failing to disclose the Oil Consumption and Battery Defects and the associated

safety risks and repair costs that result from them, Defendants have knowingly and intentionally

concealed material facts and breached their duty not to do so.

266.     The facts concealed or not disclosed by Defendants to Plaintiffs Bang and LeSieur

and the California Class Members are material in that a reasonable consumer would have

considered them to be important in deciding whether to purchase Defendants' Class Vehicles or

pay a lesser price.  Had Plaintiffs Bang and LeSieur and the California Class Members known

about the defective nature of the Class Vehicles and their engines, they would not have

purchased the Class Vehicles or would have paid less for them.

267.     The facts concealed and omitted by Defendants to Plaintiffs Bang and LeSieur

and the other California Class Members are material in that a reasonable consumer would have

considered them to be important in deciding whether to purchase or lease the Class Vehicles or

pay a lower price.  Had Plaintiffs Bang and LeSieur and the other California Class Members

known about the Oil Consumption and Battery Defects contained in the Class Vehicles, they

would not have purchased or leased the Class Vehicles or would not have paid the prices they

paid.

268.     Such misconduct materially affected the purchasing decisions of Plaintiffs Bang

and LeSieur and the California Class Members.

269.     The injuries suffered by Plaintiffs Bang and LeSieur and the other California Class Members were proximately caused by Defendants' fraudulent and deceptive business practices.

270.     Plaintiffs Bang and LeSieur and the California Class Members are entitled to injunctive relief monetary, compensatory, and punitive damages

271.     Plaintiffs Bang and LeSieur have provided Defendants with notice of their alleged violations of the CLRA pursuant to California Civil Code § 1782(a).  Defendants have failed to provide appropriate relief for their violation of the CLRA.

## COUNT VI

**Violation of the California Business and Professional Code**

**(California Business and Professional Code § 17200)**

**(By Plaintiffs Bang and LeSieur on Behalf of the California Class)**

272.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

273.     The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.

274.     Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs Bang and LeSieur and the Class Members that the Class Vehicles suffer from a design defect (and the costs, safety risks, and diminished value of the vehicles as a result of this problem).  Defendants should have disclosed this information because they were in a superior position to know the true facts related to this design defect, and

64

Plaintiffs Bang and LeSieur and Class Members could not reasonably be expected to learn or discover the true facts related to this defect.

275.    The Oil Consumption and Battery Defects constitute a safety issue that triggered Defendants' duty to disclose the safety issue to consumers.

276.    These acts and practices have deceived Plaintiffs Bang and LeSieur and the California Class Members and are likely to deceive the public.  In failing to disclose the design defect and suppressing other material facts from Plaintiffs Bang and LeSieur and the California Class Members, Defendants breached their duty to disclose these facts, violated the UCL, and caused injuries to Plaintiffs Bang and LeSieur and the California Class Members.  The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs Bang and LeSieur and California Class Members, as they would have been to all reasonable consumers.

277.    The injuries suffered by Plaintiffs Bang and LeSieur and the California Class Members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs Bang and LeSieur and the California Class Members should have reasonably avoided.

278.    Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq*., and California Commercial Code § 2313.

279.    Plaintiffs Bang and LeSieur seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business and Professions Code § 17200.

## COUNT VII

**Violation of the California False Advertising Law**

**(California Business and Professional Code § 17500, *et seq*.)**

**(By Plaintiffs Bang and LeSieur on Behalf of the California Class)**

280.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

281.    California Business & Professions Code § 17500 states:  "It is unlawful for any . . . corporation  . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

282.    Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs Bang and LeSieur and the other California Class Members.

283.    Defendants have violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of their Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

66

284.     Plaintiffs Bang and LeSieur and the other California Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiffs Bang and LeSieur and the other California Class Members relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles.  Defendants' representations were untrue because the Class Vehicles are distributed with the Oil Consumption and Battery Defects.  Had Plaintiffs Bang and LeSieur and the other California Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

285.     Accordingly, Plaintiffs Bang and LeSieur and the other California Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

286.     Plaintiffs Bang and LeSieur, each individually as well as on behalf of the California Class, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs Bang and LeSieur and the other California Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT VIII

### Violation of the Song-Beverly Act – Breach of Express Warranty

### (California Civil Code §§ 1792, 1791.1, *et seq.*)

### (By Plaintiffs Bang and LeSieur on Behalf of the California Class)

287.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

288.     Plaintiffs Plaintiffs Bang and LeSieur and the other California Class Members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of California Civil Code § 1791(b).

289.     The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

290.     BMW is a "manufacturer" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

291.     Plaintiffs Bang and LeSieur and the other California Class Members bought/leased new motor vehicles manufactured by Defendants.

292.     Defendants made express warranties to Plaintiffs Bang and LeSieur and the other California Class Members within the meaning of California Civil Code §§ 1791.2 and 1793.2, as described above.

293.     As set forth above in detail, the Class Vehicles are inherently defective in that the Oil Consumption and Battery Defects in the Class Vehicles substantially impair the use, value, and safety of the Class Vehicles to reasonable consumers like Plaintiffs Bang and LeSieur and the other California Class Members.

294.     As a result of Defendants' breach of their express warranties, Plaintiffs Bang and LeSieur and the other California Class Members received goods whose dangerous condition substantially impairs their value to Plaintiffs and the other California Class Members.  Plaintiffs Bang and LeSieur and the other California Class Members have been damaged as a result of, inter alia, the diminished value of Defendants' products, the products' malfunctioning, and the nonuse of their Class Vehicles.

295.     Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiffs Bang and LeSieur and the other California Class Members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

296.     Pursuant to California Civil Code § 1794, Plaintiffs Bang and LeSieur and the other California Class Members are entitled to costs and attorneys' fees.

## COUNT IX

### Violation of the Song-Beverly Act – Breach of Implied Warranty

### (California Civil Code §§ 1792, 1791.1, *et seq.*)

### (By Plaintiffs Plaintiffs Bang and LeSieur on Behalf of the California Class)

297.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

298.     BMW was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.  Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

299.     Defendants provided Plaintiffs Bang and LeSieur and the California Class Members with an implied warranty that the Class Vehicles and any parts thereof are

69

merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their engines suffered from an inherent defect at the time of sale that causes the consumption of an abnormally high amount of oil and premature battery wear; to wit, the Defects herein alleged.  Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

300.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not consume an abnormally high amount of oil between scheduled oil changes or cause premature wear to the battery; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

301.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs Bang and LeSieur and the California Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including but not limited to the defective design and/or manufacture of their N63 engines that suffer from the Oil Consumption and Battery Defects alleged herein.

302.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

70

## COUNT X

### Violation of New York General Business Law § 349

### (N.Y. Gen. Bus. Law. § 349)

### (By Plaintiff Bezems on Behalf of the New York Class)

303.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

304.     Plaintiff Bezems brings Count X on behalf of himself and the New York Class.

305.     New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

306.     In the course of Defendants' business, they willfully failed to disclose and actively concealed that the Class Vehicles are defective. The existence of the defect, which manifests in all or substantially all Class Vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to thousands of dollars in repair expenses, requires expensive and inconvenient maintenance efforts, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued.  Defendants' failure to disclose the defects and their ramifications offends public policy and is unethical, unscrupulous, and substantially injurious to consumers.  Defendants' also made affirmative misstatements, as set forth above.

307.     Accordingly, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have and otherwise engaging in conduct likely to deceive.

308.     Defendants' actions set forth above occurred in the conduct of trade or commerce.

309.    Because Defendants' deception takes place in the context of automobile safety, its deception affects the public interest.  Further, Defendants' unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

310.    Defendants' conduct proximately caused injuries to Plaintiff Bezems and the other New York Class Members.

311.    Plaintiff and the other New York Class members were injured as a result of Defendants' conduct in that Plaintiff and the other New York Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

**COUNT XI**

**Violation of New York General Business Law § 350**

**(N.Y. Gen. Bus. Law. § 350)**

**(By Plaintiff Bezems on Behalf of the New York Class)**

312.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

313.    Plaintiff Bezems brings Count XI on behalf of himself and the New York Class.

314.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]"  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light

72

of . . . representations [made] with respect to the commodity. . . ."  N.Y. GEN. BUS. LAW § 350-a.

315.    Defendants caused to be made or disseminated through New York, through representations, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiff Bezems and other New York Class Members.

316.    Defendants have violated N.Y. GEN. BUS. LAW § 350 because they misrepresented and omitted facts regarding the Oil Consumption Defect in New York Class Vehicles, as described above, which were material and likely to deceive a reasonable consumer.

317.    Defendants also violated N.Y. GEN. BUS. LAW § 350 because they misrepresented and omitted facts regarding the Battery Defect in New York Class Vehicles, as described above, which were material and likely to deceive a reasonable consumer.

318.    Plaintiff Bezems and the other New York Class members have suffered injury, including the loss of money or property, as a result of Defendants' false advertising.  In purchasing or leasing their Class Vehicles, Plaintiff and the other Class Members relied on the misrepresentations and/or omissions of Defendants with respect to the safety, quality, functionality, and reliability of the Class Vehicles.  Defendants' representations turned out to be untrue because the defects described within renders the Class Vehicles prone to causing premature wear of internal parts, inadequate performance, and/or catastrophic engine failure, and other failures as described hereinabove.  Had Plaintiff Bezems and the other Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

319.    Accordingly, Plaintiff Bezems and the other New York Class Members overpaid for their Class Vehicles and did not receive the benefit of the bargain for their Class Vehicles, which have also suffered diminution in value.

320.    Plaintiff Bezems, individually and on behalf of the New York Class, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its unfair, unlawful and/or deceptive practices.

321.    Plaintiff Bezems and the other Class Members are also entitled to recover their actual damages or $500, whichever is greater.  Because Defendants acted willfully or knowingly, Plaintiff and the other Class members are entitled to recover three times actual damages, up to $10,000.

## COUNT XII

### Violation of the Washington Consumer Protection Act

### (RCW 19.86 *et seq*.)

### (By Plaintiff Bengulescu on Behalf of the Washington Class)

322.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

323.     Plaintiff Bengulescu brings Count XII on behalf of himself and the Washington Class.

324.    Defendants engaged in unfair and/or deceptive acts by, inter alia, failing to state, concealing, suppressing, and omitting the fact that Class Vehicles suffer from the Oil Consumption and Battery Defects before selling these vehicles into the stream of commerce.

74

325. These defects were material because an ordinary purchase would attach importance to these defects when deciding whether to purchase a Class Vehicle or another, similar model from Defendants or another luxury automotive manufacturer.

326. Defendants sold and leased Class Vehicles with full knowledge they suffered from the Oil Consumption and Battery Defects.

327. Even if Defendants did not know the details of these defects, they had reason to know due to their actual, superior, and specialized knowledge of the N63 engine and Class Vehicles and took advantage of Plaintiff Bengulescu's and Washington Class Members' ignorance.

328. Defendants continue to willfully conceal, suppress, and omit the material fact that Class Vehicles contain defects that deprive Plaintiff Bengulescu and Washington Class Members of covered warranty repairs and/or replacements of defective components.

329. Defendants misrepresented to Plaintiff Bengulescu and Washington Class Members that a purchase or lease of a Class Vehicle entitled the consumer to certain rights and remedies, including a promise to repair all vehicles to a non-defective state at no cost to the owner, when Defendants did not intend to honor such rights and remedies.  These misrepresentations had the tendency to mislead a reasonable consumer.

330. Defendants' failure to fulfill obligations, rights, and remedies that supposedly accompanied the purchase or lease of Class Vehicles deprived Plaintiff Bengulescu and Washington Class Members of a material benefit of the transaction, which constitutes an unconscionable act or practice.

331.     No reasonable consumer would have purchased or leased a Class Vehicle if he or she had known about the serious defects and Defendants intentions not to honor their warranty obligations.

332.     As a direct and proximate result of Defendants' failure to disclose and suppression of material defects, and Defendants' failure to adhere to the New Vehicle Limited Warranty and the implied warranty of merchantability, Plaintiff Bengulescu and Washington Class Members sustained damages and other losses in an amount to be determined at trial.

333.     Plaintiff Bengulescu, individually and on behalf of the Washington Class, seeks all damages permitted by law, including compensation for the monetary difference between Class Vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred due to Class Vehicle breakdowns caused by the Defects; the cost of purchasing, leasing, or renting replacement vehicles; along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

334.     Plaintiff Bengulescu and other members of the Washington Class are also entitled to attorneys' fees and costs pursuant to the Washington Consumer Protection Act. RCW 19.86.090.

<u>COUNT XIII</u>
**Violation of the Kansas Consumer Protection Act**

**(K.S.A. § 50-623, *et seq*.)**

**(By Plaintiff Crockett on Behalf of the Kansas Class)**

335.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

336.    Plaintiff Crockett and Kansas Class Members are "consumers" under K.S.A. § 50-624(b) who engaged in a "consumer transaction" under § 50-624(c) when purchasing Class Vehicles.  Defendants are "supplier[s]" under K.S.A. § 50-624(l) because they sell and distribute consumer automobiles in the ordinary course of business.

337.    Defendants willfully failed to state, concealed, suppressed, and omitted the fact that Class Vehicles suffer from the Oil Consumption and Battery Defects before selling these vehicles to Plaintiff Crockett and Kansas Class Members in violation of K.S.A. § 50-626.

338.    These defects were material because an ordinary purchase would attach importance to these defects when deciding whether to purchase a Class Vehicle or another, similar model from Defendants or another luxury automotive manufacturer.

339.    Defendants sold and leased Class Vehicles with full knowledge they suffered from the Oil Consumption and Battery Defects.

340.    Even if Defendants did not know the details of these defects, they had reason to know due to their actual, superior, and specialized knowledge of the N63 engine and Class Vehicles and took advantage of Plaintiff Crockett's and Kansas Class Members' ignorance.

341.    Defendants continue to willfully conceal, suppress, and omit the material fact that Class Vehicles contain defects that deprive Plaintiff Crockett and Kansas Class Members of covered warranty repairs and/or replacements of defective components.

342.    Defendants misrepresented to Plaintiff Crockett and Kansas Class Members that a purchase or lease of a Class Vehicle entitled the consumer to certain rights and remedies, including a promise to repair all vehicles to a non-defective state at no cost to the owner, when Defendants did not intend to honor such rights and remedies. These misrepresentations had the tendency to mislead a reasonable consumer.

343.     Defendants' failure to fulfill obligations, rights and remedies that supposedly accompanied the purchase or lease of Class Vehicles deprive Plaintiff Crockett and the Kansas Class of a material benefit of the transaction, which constitutes an unconscionable act or practice under K.S.A. § 50-627.

344.     No reasonable consumer would have purchased or leased a Class Vehicle if he or she had known about the serious defects and Defendants intentions not to honor their warranty obligations.

345.     As a direct and proximate result of Defendants' failures to disclose and suppression of material defects, and Defendants' failure to adhere to the New Vehicle Limited Warranty and the implied warranty of merchantability, Plaintiff Crockett and Kansas Class Members sustained damages and other losses in an amount to be determined at trial.

346.     Plaintiff Crockett, individually and on behalf of the Kansas Class, seeks all damages permitted by law, including compensation for the monetary difference between Class Vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred due to Class Vehicle breakdowns; the cost of purchasing, leasing, or renting replacement vehicles; along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## COUNT XIV

**Violation of the Texas Deceptive Practices Act**

**(Tex. Bus. & Com. Code § 17.41, *et seq*.)**

**(By Plaintiff Gorener on Behalf of the Texas Class)**

347.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

348.     Plaintiff Gorener brings Count XIV on behalf of themselves and the Texas Class.

349.     Class Vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1) because they are tangible chattels that were purchased or leased for use.

350.     Each Defendant is a "person" under Tex. Bus. & Com. Code § 17.45(3) because it is a corporation.

351.     Plaintiff Gorener and the other Texas Class Members are "consumers" under Tex. Bus. & Com. Code § 17.45(4) because they sought or acquired Class Vehicles by purchase or lease.

352.     At all relevant times, Defendants have engaged in "trade" and "commerce" under Tex. Bus. & Com. Code § 17.45(6) by advertising, offering for sale, selling, leasing, and/or distributing Class Vehicles in the United States, including Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

353.     The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code § 17.41, et seq.  Specifically, as described above, Defendants misrepresented that Class Vehicles have characteristics, uses, and/or benefits that they do not have.  Furthermore, Defendants failed to disclose information concerning Class Vehicles that was known at the time of their sale, and such failure to disclose that information was intended to induce consumers into purchases they would not have entered had the information been disclosed.

354.     Plaintiff Gorener and the other Texas Class Members relied to their detriment on those false, misleading, or deceptive acts or practices.

355.    Those "false, misleading, or deceptive acts or practices" were a producing cause of the economic damages sustained by Plaintiff Gorener and the other Texas Class Members.

356.    Defendants' intentional concealment of and failure to disclose the Oil Consumption and Battery Defects constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiff Gorener and other Texas Class Members, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree.  That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiff Gorener and the other Texas Class Members.

357.    Defendants are also liable under Tex. Bus. & Com. Code § 17.50(a) because Defendants breach of the implied warranty of merchantability set forth above was a producing cause of economic damages sustained by Plaintiff Gorener and the other Texas Class Members.

358.    Defendants' violations of the DTPA were made in connection with the purchase or lease of Class Vehicles by Plaintiff Gorener and the other members of the Texas Class

359.    Plaintiff Gorener and the other Texas Class Members relied on Defendants to disclose material information it knew, such as the defective nature of the vehicles equipped with the N63 engine, and not to induce them into transactions they would not have entered had the Defendants disclosed this information.

360.    Plaintiffs Gorener have provided adequate notice to Defendants.

361.    Plaintiffs Gorener and the other Texas Class Members should be awarded three times the amount of their economic damages because Defendants intentionally concealed and failed to disclose the defective nature of Class Vehicles.

## COUNT XV

**Violation of the Connecticut Deceptive Trade Practices Act**

**(Conn. Gen. Stat. Ann. § 42-100a, *et seq*.)**

**(By Plaintiff Marcus on Behalf of the Connecticut Class)**

362.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

363.    Plaintiff Marcus and the other Connecticut Class Members are "person[s] who suffer[ed] ascertainable loss" by a prohibited practice under Conn. Gen. Stat. Ann. § 42-110g.

364.    At all relevant times, Defendants have engaged in "trade" and "commerce" under Conn. Gen. Stat. Ann. § 42-110a(4) by advertising, offering for sale, selling, leasing, and/or distributing Class Vehicles in the United States, including Connecticut, directly or indirectly affecting Connecticut citizens through that trade and commerce.

365.    The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Connecticut's Deceptive Trade Practices Act ("CDPA"), § 42-110(b).  Specifically, as described above, Defendants misrepresented that Class Vehicles have characteristics, uses, and/or benefits that they do not have.  Furthermore, Defendants failed to disclose information concerning Class Vehicles that was known at the time of their sale, and such failure to disclose that information was intended to induce consumers into purchases they would not have entered had the information been disclosed.

366.    Plaintiff Marcus and the other Connecticut Class Members relied to their detriment on those false, misleading, or deceptive acts or practices.

367.    Those false, misleading, or deceptive acts or practices were a producing cause of the economic damages sustained by Plaintiff Marcus and the other Connecticut Class Members.

368.    Defendants are also liable under § 42-110(b) because Defendants breach of the implied warranty of merchantability set forth above was a producing cause of economic damages sustained by Plaintiff Marcus and the other Connecticut Class Members.

369.    Defendants' violations of the CTPA were made in connection with the purchase or lease of Class Vehicles by Plaintiff Marcus and the other members of the Connecticut Class

370.    Plaintiff Marcus and the other Connecticut Class Members relied on Defendants to disclose material information it knew, such as the defective nature of the vehicles equipped with the N63 engine, and not to induce them into transactions they would not have entered had the Defendants disclosed this information

371.    Plaintiffs Marcus has provided adequate notice to Defendants.  Plaintiffs Marcus and the other Connecticut Class Members should be awarded three times the amount of their economic damages because Defendants intentionally concealed and failed to disclose the defective nature of Class Vehicles.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray that this case be certified and maintained as a class action pursuant to one or more of the proposed Classes, as they may be modified or amended, and respectfully requests this Court:

a.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

b.    Appoint Plaintiffs as the representatives of the Classes and their counsel as Class counsel;

82

c.      Award damages, including compensatory and exemplary damages, to Plaintiffs and all other Class Members;

d.      Award Plaintiffs and Class Members actual damages sustained;

e.      Grant restitution to Plaintiffs and Class Members and require Defendants to disgorge inequitable gains;

f.      Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the defect;

g.      Award Plaintiffs and Class Members punitive damages;

h.      Award Plaintiffs and Class Members their reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

i.      Award such other relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  March 21, 2016         By:   *//s// Matthew D. Schelkopf*
                                     MCCUNEWRIGHT LLP
                                     Joseph G. Sauder, (#03079-1998)
                                     Email:  JGS@mccunewright.com
                                     Matthew D. Schelkopf, (#03036-2002)
                                     Email:  MDS@mccunewright.com
                                     Joseph B. Kenney (#08558-2013)
                                     Email: JBK@mccunewright.com
                                     1055 Westlakes Drive, Suite 300
                                     Berwyn, Pennsylvania 19312
                                     Telephone: (610) 200-0581

                                     Richard D. McCune (CA #132124)*
                                     Email: rdm@mccunewright.com
                                     David C. Wright (CA #177468)*

Email: dcw@mccunewright.com
Daniel H. Chang (CA #183803)*
Email: dhc@mccunewright.com
Michele M. Vercoski, (NJ #03101-2004)
Email: mmv@mccunewright.com
2068 Orange Tree Lane, Suite 216
Redlands, California 92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

**WAGSTAFF & CARTMELL LLP**
Eric D. Barton (KS # 16503)*
Email: ebarton@wagstaffcartmell.com
David P. Barclay (MO # 67256)*
Email: dbarclay@wagstaffcartmell.com
4740 Grand Avenue, Ste. 300
Kansas City, Missouri 64112
Telephone: (816) 701-1100
Facsimile: (816) 531-2372

**CAPSTONE LAW APC**
Jordan L. Lurie (SBN 130013)
Jordan.Lurie@capstonelawyers.com
Robert Friedl (SBN 134947)
Robert.Friedl@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
1840 Century Park East, Suite 450
Los Angeles, California 90067
Telephone: (310) 556-4811
Facsimile: (310) 943-0396

**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
Todd M. Friedman, Esq. (SBN 216752)
tfriedman@attorneysforconsumers.com
Adrian R. Bacon (SBN 280332)
abacon@attorneysforconsumers.com
324 S. Beverly Dr., #725
Beverly Hills, CA 90212
Phone: 877-206-4741
Fax: 866-633-0228

*Attorneys for Plaintiffs and the Proposed Class*

84